UNITED STATES, Appellant

v.

PAUL S. MORENO, Private First Class, U. S. Marine Corps, Appellee

5 USCMA 500, 18 CMR 124

No. 5252

Decided March 4, 1955

LCDR M. M. Seydel, USN, for Appellant.

CDR Earl C. Collins, USN, for Appellee.

## Opinion of the Court

ROBERT E. QUINN, Chief Judge:

The accused was convicted for involuntary manslaughter in violation of Article 119, Uniform Code of Military Justice, 50 USC § 713. On appeal, a board of review set aside the conviction and dismissed the charge because it believed the evidence insufficient to support the findings of guilt. The Judge Advocate General of the Navy thereupon asked this Court to review the correctness of the board of review's determination.

Subsequent to its filing, the accused moved to dismiss the certificate for re-

view on the ground that the decision of the board of review was based upon findings of fact, and it, therefore, raised no matters of law for consideration by this Court. The motion was denied without prejudice.

After careful consideration of the written opinion of the board of review, we have substantial doubt █ as to the actual basis for its decision. We cannot arbitrarily resolve that doubt. The board of review's fact-finding power is plenary. If the board of review's decision is rooted solely in findings of fact, and those findings are supported by substantial evidence, there is no basis for further review in this Court. United States v. Hernandez, 4 USCMA 465, 16 CMR 39; United States v. Sell, 3 USCMA 202, 11 CMR 202. Consequently, we return the case to the board of review for clarification of its opinion.

Judge BROSMAN concurs.

LATIMER, Judge (dissenting):

I dissent.

The disposition of this case does no more than put off the fatal day of reckoning as the board of review went to some length to explain its holding and there is little more it can say. The reasoning advanced and the disposition ordered indicate that the board was convinced that the evidence was insufficient, as a matter of law, to support the finding. I take the position it erred in so holding and that it should be informed of our views.

We have previously considered the powers granted us by the Uniform Code of Military Justice to interfere with a decision of a board of review and we have commented on the limitations imposed upon us. See United States v. Thompson, 2 USCMA 460, 9 CMR 90; United States v. Engle, 3 USCMA 41, 11 CMR 41; United States v. Sell, 3 USCMA 202, 11 CMR 202; and United States v. Benson, 3 USCMA 351, 12 CMR 107. In United States v. Sell, supra, we announced the principles which are controlling when the issue

facing us grows out of our right to review a holding that the evidence is insufficient to support the finding of guilty. I quote first from the majority opinion in that case and then from Judge Brosman's concurring opinion:

"There is one additional matter upon which we desire to comment. It would expedite the review of cases in this Court if boards of review would express clearly when they are exercising their fact-finding powers. We have no disposition to interfere with those powers except as they involve questions of law. So there will be no misunderstanding, we announce our views on that principle. *Whether there is sufficient evidence to sustain a finding of guilty is a matter of law.* We review a record for that purpose and if there is not, we reverse. We cannot, however, review a record when a court-martial has concluded there is insufficient evidence to sustain a finding and it returns a verdict of not guilty. There is no appeal by the Government from that finding and the record never reaches this Court. The procedure differs when applied to a board of review. There is, in a sense, an appeal by the Government if The Judge Advocate General certifies the case, but our review is limited to questions of law. We cannot determine wherein lies the weight of the evidence nor determine the credibility of witnesses and we cannot overturn a finding of fact made by a board of review, if it is no more than that. *However, if the review presents a question of law such as when a board of review reverses a finding of a court-martial because the evidence is insufficient to support it, without making an independent factual determination, then we have the power and authority and it is our duty to review that narrow issue.*" [Emphasis supplied.]

Judge Brosman set forth his concept in the following language:

". . . As I understand relevant portions of the Uniform Code, we may review rulings of a board on questions of mixed law and fact as well as on those of law. The only

502

rulings removed from our consideration are those having to do with pure fact. Here a legal standard was clearly involved in the board's determination that 'The evidence . . . does not disclose that the accused was given an order before the words set forth in the specification were uttered by him.' The question is, therefore, one embracing a distinct legal element and thus reviewable in this Court."

The principle is easy to state but difficult to apply when, as here, a board has legal and fact-finding powers and we are forced to interpret its language which intermixes the two. It must be conceded that there is some language used in the board's opinion which lends credence to the assertion that a factual determination was made; but, when the opinion is considered from its four corners and the results are taken into account, I am forced to conclude that regardless of the language used the decision was one of law. The manner in which the board limited and posed the question it was considering; the affirmative adoption of a test usable legally to measure the finding of the court-martial; the failure to reject or question any given testimony; the silence concerning the veracity of any of the witnesses or the probability or improbability of their stories; the absence of any conflicts in testimony to be resolved by it; the announced reliance on a total lack of evidence of identity of the perpetrator of the crime; and the disposition made of the case, weigh heavily in favor of a conclusion that the board of review was not screening facts. On the contrary, it was accepting all testimony at face value, considering it as one package of evidence and then weighing the bundle on legal scales to determine its sufficiency or insufficiency to support the finding.

We must, of course, permit boards of review to exercise the authority given them by Congress to determine the weight of the evidence without interference by us, when they are operating in that field. Contrariwise, they cannot deny us the power to review by labelling a matter of law as being one of fact. It might be well to consider that there are a few principles which, if applied in this instance, might aid in the determination of whether the present ruling can be reached by us. As a general proposition the fact-finding processes can be identified in cases where there is a dispute in the testimony and it is necessary for a board of review to pit its judgment against that of the court-martial to determine wherein lies the truth. Here the facts are undisputed, they were accepted without question, and they were then found to be insufficient to sustain the finding. A ruling based on that ground is one of law. Illustrative of that principle is a motion for a finding of not guilty based on insufficiency of the evidence. If, in the present instance, I appraise correctly the board of review's reasoning, it would be no more than a rationalization that had the defense counsel made that motion at the appropriate time, the law officer would have erred in denying it. The reasoning advanced on identity by the board of review in its decision would have permitted the law officer to have properly dismissed the case on a motion for a finding of not guilty.

Perhaps one of the best ways in which to rephrase my concepts as to when we may review a ruling such as this is: If a board of review in its decision does not indicate it is putting on its fact-finding robe and weighing facts on its own scales, independent from those used by the court-martial; or, that it is assessing the credibility of any witness to such an extent as to question the truthfulness or probability of his testimony, and yet it finds the evidence insufficient to support the finding, it has framed a question of law which is reviewable by us. That rule only places on a board of review the duty to state with specificity the weighing process it uses when it is resolving factual issues at the appellate level. So long as the board does not do that, we must apply the usual rules of construction to the opinion and draw our own conclusions from the information furnished and the results reached. Conceding that the wording of the opinion is ambiguous, it contains language to the effect that the findings are in-

**503**

correct in law, and I believe that expresses fairly the rationale of the board. I, therefore, conclude that the ruling was not one of fact and that the board of review did not intend to frame its decision in that area but intended to act squarely in the field of law. Based on that conclusion, under the authority of Article 67 (d) of the Code, 50 USC § 654, we are authorized to review the ruling.

I think it worthwhile to set forth a detailed statement of facts to show why I would reverse a finding █ that this evidence is insufficient as a matter of law. Prefatory to relating them, I accent two matters I have previously mentioned. First, there are no disputes in the facts about the tragedy and no reconciliation of testimony is required. Second, there is no witness whose credibility is questioned, there is no improbable or unbelievable testimony found in the record, and if the evidence discloses any interest or bias on the part of any or all witnesses, which I doubt, it tends to suggest the witnesses preferred to shield the accused rather than to convict him. Accordingly, I move on to relate the facts which were presented to the court-martial and which the board of review assessed as insufficient to support a finding of guilt.

The locale of the shooting was in the truck park of the 7th Motor Transportation Battalion in Korea. It was about 11:00 o'clock in the morning and a number of the drivers were servicing their trucks. They were individually issued M-1 rifles and not .45 caliber pistols. In all probability their arms were not in the parking area, but if they were, they would be in a rifle case attached in the truck. At least three members of the truck company, aside from the accused and the victim, were within four to five feet of the shooting. Just prior to being shot, the victim was standing between two trucks which were spaced so closely together that the left side of one vehicle was not over three and one-half to four feet from the right side of the other vehicle. The victim was standing on the ground looking up at, and talking to, the ac-

**504**

cused who was either seated in the cab or standing on the right running board of his truck. A witness by the name of Powell was standing by the right front fender of the accused's truck and he could not have been more than four to six feet away from the accused. A witness identified as Corporal Zalipiski had been servicing his truck which was some four truck intervals removed from the one driven by the accused. He had left his position and was walking around the accused's truck when he heard the weapon fire. Just before the explosion he was close enough to hear the conversation carried on between the victim and the accused. A third marine in close proximity to the shooting was Private Lambert. He was working over the left front fender of his truck cleaning the battery. He estimated he was three and one-half feet from the victim when the pistol was discharged. It is worthy of note that each of those witnesses testified he was not looking toward the parties until he heard the report of the weapon firing, and then he turned immediately and noticed the position of the accused and the victim. There was only one round fired and one shot heard. It should be accepted without dispute that a person who is located from three to ten feet away from a weapon which is fired unexpectedly reacts automatically and spontaneously looks in the direction of the noise. The proximity of these witnesses to the firing was such that they would not, and could not, mistake the exact location from which the report emanated. That alone would exclude the highly speculative hypothesis that the lethal slug may have traveled from some area removed from the truck park. However, there is much more to complete the chain of circumstances.

There is a rare consistency in the testimony of the witnesses and an exclusion by them of other theories of killing. I have related their positions before the accident and the record shows with certainty the positions after the weapon discharged. The three witnesses I have named and two others who proceeded from their tent all testified the victim was on the ground between the two vehicles. The accused was first ob-

served standing on the running board of his truck and at that time he had a .45 automatic weapon in his hand. It was pointed toward the ground which would be about the angle necessary to point the weapon at the victim when consideration is given to the fact that accused was probably standing on the running board or partially in the cab of the truck and the victim was standing on the ground when the weapon was fired. The accused was pale and he was the only person in the vicinity of the victim who was observed with a weapon in his hand. It was a .45 caliber pistol and that type weapon was not issued to truck drivers. He alone, of the persons in the area, possessed that type of firearm. The victim died from a single gunshot wound in the head and immediately after the shooting a cartridge case of one .45 caliber bullet was found on the ground between the two vehicles about one foot away from the right side of the accused's vehicle and near a pool of blood. One ejected by a weapon in the hands of the accused would be found in that area. After the killing, a .45 caliber pistol belonging to the accused was on the seat of the cab and its clip was not fully loaded with live ammunition. The accused and the victim immediately prior to the shooting had been carrying on a conversation over a report which was to be prepared and immediately before the shooting the victim stated twice in an exaggerated fashion: "I didn't say nothing, I didn't say nothing." Finally, when the three witnesses reacted to the noise from the one shot to determine the cause of or reason for the shooting, they saw what we have previously described. Their spontaneous acts speak louder than words, and from them the conclusion follows inevitably that the firing point was the hand of the accused.

From those facts and circumstances, would all reasonable men conclude the accused shot the victim or is there a reasonable hypothesis that someone other than he did the shooting? Implicit in the board of review's decision is a belief that the latter is a reasonable possibility as it stated that evidence connecting the accused with the assumed crime was not present in the record. I would be compelled to reach a contrary conclusion. Being a circumstantial evidence case only, every reasonable theory of innocence should be excluded by the court-martial; it so found, and the evidence forced it to conclude that no one other than the accused killed the victim. The most vivid imagination can conjure up only one other possibility and that is that a ricochet slug fired from some distant point was the cause of death. I would say that theory is so improbable as to be unworthy of acceptance. The victim was in a motor park where personnel were working on trucks in broad daylight. No one in that parking area was firing and the troops were not being subjected to any enemy action. The victim was partially sheltered on two sides by vehicles. Where a ricochet would originate is unknown as there is no evidence of any troops firing in the general area and the path of a projectile coming in from outside the parking area would be channeled by the trucks. Three marines would not hear the report of the weapon firing with such startling reaction if the weapon were discharged a considerable distance away from the victim; and if it were close enough to be so plainly heard, they would not be misled as to the position of origin. Moreover, there would be no accounting for one cartridge case caliber .45 in an area of troops armed with rifles and no reasonable explanation of other incriminating circumstances. Three simple questions will accentuate the evidential factors I mention. Why would three marines, hearing a gunshot, be misled as to its location? Why would the accused, armed with a weapon of the same caliber as the expended cartridge case found near the deceased, have a gun in his hand pointed toward the victim at the time of death when his assigned duty at the moment was servicing a truck? Why would the victim be protesting in an exaggerated manner that he did not say anything unless he was subjected to some act causing apprehension? How remarkable the timing would be for a ricochet slug to hit at precisely the same instant that all other

related events took place. It is to be recognized that miracles may happen; but if there is any doubt about who killed the victim of this tragedy, it cannot be raised by this record or by the actions of those witnesses who were in a position to hear and to know.

The accused was convicted by the court-martial of involuntary manslaughter and to establish that offense it was necessary for the prosecution to prove that the victim was dead; and that his death occurred as a result of the culpable negligence of the accused; or that the accused killed him while perpetrating an offense against his person. I do not consider the last method of committing the crime because the law officer limited his instruction to the first.

Culpable negligence necessary to sustain a finding of guilty of involuntary manslaughter is described in the Manual for Courts-Martial, United States, 1951, paragraph 198b, as follows:

"Culpable negligence is a degree of carelessness greater than simple negligence. It is a negligent act or omission accompanied by a culpable disregard for the foreseeable consequences to others of such act or omission. Thus the basis of a charge of involuntary manslaughter may be a negligent act or omission which, when viewed in the light of human experience, might foreseeably result in the death of another, even though death would not, necessarily, be a natural and probable consequence of such act or omission.

"Instances of culpable negligence are: Negligently conducting target practice so that the bullets go in the direction of an inhabited house within range; pointing a pistol in fun at another and pulling the trigger, believing, but without taking reasonable precautions to ascertain, that it would not be dangerous; carelessly leaving poisons or dangerous drugs where they may endanger life."

A lesser included offense of involuntary manslaughter is negligent homicide. That offense is defined as an unlawful killing by a negligent act of the accused. That crime partakes of a civil delict and is one that can be predicated on the doing of an act without that degree of care for the safety of a victim which a reasonably prudent person would have exercised under the same or similar circumstances. When the evidence in the instant case is measured by the standards of the two crimes as defined above, I believe that all reasonable men must conclude it is sufficient to sustain the finding returned by the court-martial members. If the death of the victim as a result of a gunshot wound was brought about by the accused, and I would so conclude, then there is sufficient evidence to support the other elements of involuntary manslaughter. Only a partial repetition of the essential facts and circumstances is necessary to establish that all ingredients of the offense have been proved beyond a reasonable doubt. There is no assertion that the killing was excusable or justifiable. The weapon had to be pointed at the head of the deceased at the time it was fired. The parties were in such close proximity that a deflection was not possible. The weapon was of such a construction that unless it was defective, which is neither asserted nor shown, it could not fire without the trigger being pulled and the grip safety compressed and released. To point a fully loaded weapon at a person's head and pull the trigger is not only reckless—it is homicidal. Without question, the accused had no intent to kill but his careless disregard for the life of the victim renders him guilty of committing the crime of involuntary manslaughter. If his act reaches that level I need not consider whether negligent homicide is likewise established by the record.

I would reverse the decision of the board of review and return the record to The Judge Advocate General of the Navy for action consistent with this opinion.