UNITED STATES, Appellee

v.

DONALD D. MASSEY, First Lieutenant, U. S. Army, Appellant

5 USCMA 514, 18 CMR 138

No. 5581

Decided March 4, 1955

Michael F. Dennis, Esq., Lt Col Harley A. Lanning, U. S. Army, and 1st Lt Justin L. Vigdor, U. S. Army, for Appellant.

Lt Col Thomas J. Newton, U. S. Army, and 1st Lt Elliott H. Eisman, U. S. Army, for Appellee.

## Opinion of the Court

Paul W. Brosman, Judge:

The accused officer in this case was tried by a general court-martial convened in Germany. He was charged in three specifications with having violated Article 134, Uniform Code of Military Justice, 50 USC § 728, by performing "indecent, lewd, and lascivious" acts with various soldiers, and in a further specification with a violation of Article 80 of the Code, 50 USC § 674, through attempting another such act. The court-martial found him guilty of the attempt alleged as well as of two of the acts specified under Article 134. He was sentenced to be dismissed from the service. The convening authority approved the findings of guilty and the sentence—and a board of review in the office of The Judge Advocate General, United States Army, later affirmed. This Court granted the accused's petition for review of the law officer's instructions having to do with corroboration, and of the post-trial advice of the staff judge advocate concerning the convening authority's want of authority to consider matters which did not constitute parts of the record of trial.

II

At the court-martial hearing the Government called several enlisted men, who testified that at various times, and while alone with one or other of them, Lieutenant Massey had fondled, or attempted to fondle, their private parts. Also, the court received in evidence an account of overheard remarks, alleged to have been made by the accused, which appeared to constitute admissions of homosexual acts or tendencies. All of these witnesses were cross-examined searchingly by defense counsel in attempts to reveal inconsistency and implausibility in their testimony.

In its own case, the defense relied heavily on character testimony. A wide variety of persons—among them officers of high military grade—averred that the accused was an extraordinarily efficient officer of excellent character—one whom, despite close observation, they did not believe to be characterized by any sort of sexual deviation. Two psychiatric witnesses testified that they, together with other psychiatrists, had examined the accused with care for the purpose of discovering an appearance of homosexual traits. No such traits were discerned. The defense also tendered in evidence the results of "lie detector" examinations both of the accused and of the several key prosecution witnesses—which tests had been conducted by an experienced polygraph operator assigned to the Army's Criminal Investigation Division. This polygraph expert had concluded that Lieutenant Massey's examination did not reveal guilty reactions—but, on the other hand, those of his alleged victims disclosed "a marked degree of an attempt at deception." On objection by trial counsel, evidence of these results and conclusions was excluded by the law officer.

The accused himself testified at great length, and denied unequivocally the several accusations of misconduct. He pointed out, too, that he was married, was the father of a child, and enjoyed normal sexual relations with his wife. Through Lieutenant Massey's testimony, as well as by cross-examination of Government witnesses, it was brought out that the former was a severe disciplinarian, and that on various occasions he had reprimanded the soldiers who had testified to homosexual misconduct on his part. The accused's wife was called as a defense witness and gave an explicit account of a happy, normal, marital relationship with him.

The members of the court displayed their serious purpose to produce a just decision by recalling all of the Government's important witnesses after the defense had rested, and subjecting them to further detailed questioning. There-

516

after both sides presented extensive arguments, and the court was closed at 1:20 p.m. At five o'clock the court reopened and indicated a wish for an instruction from the law officer "as to the definition of uncorroborated testimony." Previously the latter had made no reference to corroboration in his instructions. However, the trial counsel had prefaced his opening argument by the statement that, under the Manual for Courts-Martial, "no person may be convicted of a sexual offense on the uncorroborated testimony of a victim where the victim's testimony is uncertain, improbable, or self-contradictory." Cf. Manual, paragraph 153a. Thereafter he had proceeded to examine the Government's case from the standpoint of corroboration, and emphasized that there existed a number of circumstances which might be considered to support the several witnesses' accounts. However, the accused's lawyer had adverted to the matter of corroboration within a different context. He had indicated to the court that in most respects the defense's case was based on circumstantial evidence, and asked rhetorically, "How in the world can this accused here, how can an innocent man defend himself except by giving his own positive testimony and *corroborating* it through the use of circumstantial evidence." (Emphasis supplied.)

Confronted by the court's request for additional guidance,[1] and "in view of the importance of this additional instruction," the law officer suggested a recess. After the court reconvened at 6:35 p.m., the following transpired:

"LAW OFFICER: Gentlemen of the court, in reference to your first request I will give instruction on the definition of uncorroborated testimony. The law officer would like to advise the court that, 'to corroborate,' in law, means to add weight or credibility to a thing by additional and confirming facts or evidence. Corroborating testimony is testimony supplementary to that already given and tending to strengthen or confirm it. It is additional evidence of a different character to the same point. Where there is a failure or lack of testimony or evidence to corroborate the testimony or evidence given by an accused, then the testimony of the accused becomes uncorroborated. Corroboration of the—

"DEFENSE: May I interpose an objection to just that one particular sentence? We feel that the law is applicable to all other witnesses as well as the accused, and we ask a modification of the instruction to that extent.

"LAW OFFICER: The objection will be noted. There will be no modification.

"PRESIDENT: Will the law officer repeat that portion of his instruction?

"LAW OFFICER: Where there is a failure or lack of testimony or evidence to corroborate the testimony or evidence given by an accused, then the testimony of the accused becomes uncorroborated. Corroboration of the testimony of a victim means testimony as to some circumstantial fact or circumstance independent of the statement of the victim and may be by direct or circumstantial evidence. Corroborating testimony must tend to connect an accused with the crime and extend to every material fact necessary or essential to constitute the offense charged, to be sufficient. However, while the corroborating evidence must be such as tends to show some connection with the defendant and with the acts constituting the crime charged, yet it is not necessary that there should be corroboration as to every probative fact. In general, a person gains no corroboration merely because he repeats a statement a number of times. Hence, a witness ordinarily may not be corroborated by showing that he made statements consistent with his testimony."

Once more the court closed at 6:41 p.m. —but at 7:10 p.m. it was reopened at

---

[1] The Court's question may have reflected a recollection of the trial counsel's argument, or it may have been a product of independent research in the Manual for Courts-Martial—a copy of which, according to the record of trial, was in the hands of court members during their deliberations.

the law officer's request to permit further clarification by him as follows:

"LAW OFFICER: The law officer would like to clarify one point, just to be certain that the court has not been erroneously instructed and does not get the wrong impression. Where I gave the court instruction on corroboration, I stated in one sentence to this effect: 'Where there is a failure or lack of testimony or evidence to corroborate the testimony or evidence given by an accused, then the testimony of the accused becomes uncorroborated'. At this time, the law officer would like to admonish the court to disregard that sentence, and this sentence here will replace it: 'Where there is a failure or lack of testimony or evidence to corroborate the testimony or evidence given by a witness, then the testimony of the witness becomes uncorroborated'.

"DEFENSE: For the record, at this time the defense will withdraw the objection which we previously noted in the record.

"LAW OFFICER: In other words, the only word changed is, 'accused' to 'witness'. Such phrase is applicable to all witnesses.

"PROSECUTION: Including the accused.

"LAW OFFICER: Yes, the accused as a witness."

### III

Following the trial, but before the staff judge advocate had completed his review of the record, the defense submitted the certificate of an Armed Forces neuropsychiatrist, who recited the results of an examination of Lieutenant Massey under sodium pentothal. According to this document,

". . . Lt Massey was cross-examined and attempts were made to trick him about his past and the offenses for which he was convicted on 14 January 1954. The results of the test were unequivocal. Lt Massey was consistent throughout, and it is the firm and unequivocal opinion of the undersigned that Lt Massey was not guilty of the offenses for which he was convicted. He has a complete-

ly normal psycho-sexual life and does not have any traits of a homosexual."

In his review of the record of trial, the staff judge advocate advised the convening authority that the product of the lie detector examination had properly been excluded from evidence. He then posed the question of whether consideration should be given by the convening authority to the results of the "truth serum" interview—and apparently his statements in this connection were also designed to have application to those of the lie detector run. While he adverted to the broad language of Article 64 of the Code, 50 USC § 651, the staff judge advocate indicated that the convening authority was without power to consider evidence outside the record of trial. This same review discussed whether—assuming arguendo that the convening authority was not limited in his determination of action to the record of trial presented him—use might properly be made of the results of the sodium pentothal interview "as a prop for action." It was concluded that neither the polygraph, nor the so-called truth sera, "have attained the significance or dignity which would call for recognition of them to abrogate the findings of a general court-martial whose members saw and heard all the material witnesses and considered all of the competent evidence." As a parting shot, the staff judge advocate suggested that "it is worthy of note that this was not a close case. This record is endowed with that quantity and quality of legal evidence characterized as 'overwhelming' and 'compelling.'" For these reasons he asserted that a "timely offer of proof of the defense during the trial would not have altered my opinion and recommendation."

### IV

With reference to the instruction on corroboration—as originally phrased—we quite agree with defense counsel that the law officer should not have singled out testimony of the accused for use in the definition of corroboration. It is possible, of course, that the wording of this instruction reflected no more than the law officer's recollection of counsel's cas-

ual reference to the testimonial support of the accused's story by circumstantial evidence. Nonetheless, it might well have created in the minds of court members an impression that the accused —to merit acquittal—was under some special duty to strengthen his own testimony by means of extrinsic evidence. Clearly enough, this is not the law, for—as the law officer had earlier explained to the court[2]—the testimony of the accused could, in and of itself, serve to establish the reasonable doubt which would preclude conviction. However, that instruction had been furnished more than five hours before the delivery of the charge on corroboration, and might not have been to the fore of the court's recollection. Therefore, in view of the emphasis placed by all parties on the importance of the law officer's advice to the court with respect to corroboration, and the focus of that instruction on the *accused's* testimony, we would be led ineluctably to the conclusion that the latter had been harmed by the denial of his attorney's objection, had subsequent events not served to remove the possibility of prejudice.

One of these took the form of clarifying instructions supplied by the law officer, which appear to have met fully the objection raised by defense counsel. Despite the lapse of a further half-hour before clarification was furnished, it is highly probable that the error was cured by it. It is manifest that the members of the court had not reached their final determination at the time the law officer requested that the court be once more reopened. Otherwise, it is unlikely that they would have deliberated for an additional hour before announcing their findings. Since the decision remained wholly open, we find small reason to doubt that the explanation ultimately furnished by the law officer was taken into account in reaching this determination of court-martial action.

In any event—and conceding arguendo that the law officer should have done more than he did—the express withdrawal by defense counsel of his previous objection leaves no issue for review on appeal. We have so held in cases in which the intent and purpose of the accused's lawyer was appreciably less recognizable than here. United States v. Henry, 4 USCMA 158, 15 CMR 158; United States v. Fisher, 4 USCMA 152, 15 CMR 152; United States v. Vanderpool, 4 USCMA 561, 16 CMR 135. Cf. United States v. Smith, 5 USCMA 314, 17 CMR 314. Indeed, it is arguable that in certain of those cases the actions of counsel were attributable to mere inadvertence, or even unawareness of the legal issue posed. Here, however, the situation is quite different. There can be no doubt that this attorney fully understood the nature of the flaw in the instruction as originally delivered. He was also in an excellent position to recognize the matter to which the court was addressing itself when its members sought a definition of "uncorroborated testimony," and to evaluate the interpretation they were likely to place on the law officer's instructional language. Yet he specifically withdrew his initial objection. Throughout the trial, defense counsel demonstrated both alertness and competence in high degree. Therefore we see no reason to reject his appraisal of the law officer's amendatory advice, and his view that it had corrected all danger of misapprehension which might have been created by the former unfortunate phraseology.

V

This Court has assiduously sought to

---

[2] The instruction on this point by the law officer was as follows:

"Gentlemen, the accused in this case has testified in his own behalf. His testimony should be taken and considered and weighed by you the same as that of any other witness in the case. In determining the accused's credibility as a witness, all reasonable doubts are to be resolved in his favor, whether they arise as a result of the evidence, from the absence of evidence, from conflicts in the evidence, or are created by the testimony of the defendant alone. And if, on the testimony of the defendant alone, a reasonable doubt has been created and remains in the mind of any one or more of the court of the truth of any material allegation in the charges and specifications, the court would not be warranted in convicting him."

preserve the fairness of the post-trial review demanded by the Code, and to assure that its procedures are accomplished in the manner intended by Congress. United States v. Coulter, 3 USCMA 657, 14 CMR 75; United States v. Crunk, 4 USCMA 290, 15 CMR 290; United States v. Clisson, 5 USCMA 277, 17 CMR 277; United States v. Hightower, 5 USCMA 385, 18 CMR 9. Accordingly, it is required that we determine whether—by his review—the staff judge advocate unduly limited the scrutiny which might properly have been accorded the record of Lieutenant Massey's trial by the convening authority.

Article 64 of the Uniform Code of Military Justice provides that "In acting on the findings and sentence of a court-martial, the convening authority shall approve only such findings of guilty, and the sentence or such part or amount of the sentence, as he finds correct in law and fact and as he *in his discretion* determines should be approved." (Emphasis supplied.) The legislative history of the Code makes it clear beyond doubt that the words "in his discretion" were intended to grant to the convening authority an exceedingly broad power to disapprove a finding or a sentence. Originally these words were absent from the Code's draft. However, from the first the official commentary on the proposed Article 64 of the Code stated that the convening authority "may disapprove a finding or a sentence for *any* reason." (Emphasis supplied.) Hearings before the House Committee on Armed Services, 81st Congress, 1st Session, on H. R. 2498, pages 1182–1183. Mr. Larkin, one of the Code's principal draftsmen, explained that Article 64 "was intended to give him [the convening authority] a free hand in doing anything he wants for any reason in cutting down the sentence or in disapproving." However, certain members of Congress feared that the phrasing of the Article—as it then stood—was insufficient to make this fully comprehensible. Certain of the colloquy concerning the draftsmen's intention is highly pertinent to the present case:

"MR. BROOKS. He [the convening authority] doesn't have to read the record or anything esle [sic]. He can just say disapproved and it is through.

"MR. LARKIN. That is right. In the normal course of the review of the case he looks to its legality and the establishment of the facts and the appropriateness of the sentence and he shouldn't approve anything that is wrong or illegal, but he can disapprove it if it is illegal, if it is wrong, and for any other reason.

"MR. BROOKS. Or for no reason at all?

"MR. LARKIN. Or for no reason at all.

"MR. RIVERS. That is right.

"MR. LARKIN. The classic case that I think General Eisenhower stated in his testimony before your subcommittee last year was that even though you might have a case where a man is convicted and it is a legal conviction and it is sustainable, that man may have such a unique value and may be of such importance in a certain circumstance in a war area that the commanding officer may say 'Well he did it all right and they proved it all right, but I need him and I want him and I am just going to bust this case because I want to send him on this special mission.' " [House Hearings, supra, page 1184.]

With the preceding discussion in mind, the words "in his discretion" were inserted. House Hearings, supra, page 1266. No sort of similar phrase appears in Articles 66 or 67, which provide for review by a board of review and by this Court.

Like the present staff judge advocate, we entertain no doubt that the results of either a sodium pentothal interview or a "lie detector" interrogation are inadmissible in evidence before a court-martial. See United States v. Adkins, 5 USCMA 492, 18 CMR 116; United States v. Bourchier, 5 USCMA 15, 17 CMR 15. However, to say that they are inadmissible in evidence is not at all to say that they are so devoid of merit that no reasonable person would be justified in according them the slight-

est weight. Cf. United States v. Adkins, supra. In fact the United States Army, in its Field Manual having to do with criminal investigation recognizes that polygraphic examinations may be highly useful for investigative purposes. See paragraph 68, FM 19-20, July 1951. Indeed, the defense offer of proof shows that the Criminal Investigation Division operator, whose services were used here, had interrogated polygraphically more than 2,000 individuals during his military career— a circumstance which would suggest forcefully that the military establishment does not regard the lie detector as worthless. Of course, a so-called "lie detector," or even a "truth serum," is not infallible, and both are subject to the perils of conscious deception by a suspect. This fallibility—together with the prospect that court members or jurors may attach undue weight to uncertain results—may serve to explain their usual exclusion by civilian and military courts alike. Nevertheless, we see no basis whatever for the suggestion that a convening authority, who may lawfully disapprove findings or sentence "for *any* reason," cannot permissibly utilize "lie detector" or "truth serum" results in determining on a course of action. (Emphasis supplied.)

A different principle would obtain, we are sure, if this functionary were limited by the requirements set out in Article 73 with respect to a petition for new trial. One of the criteria provided by the Manual for Courts-Martial for actions on such a petition is that "newly discovered evidence, if considered by a court-martial in the light of all other pertinent evidence, would probably produce a substantially more favorable result for the accused." Paragraph 109*d* (2) (*c*). Naturally evidence inadmissible at a trial by court-martial could scarcely be expected to produce "a . . . more favorable result" at a new trial— since it would not reach the court-martial. Cf. United States v. Bourchier, supra.

The staff judge advocate seems to have believed that United States v. Duffy, 3 USCMA 20, 11 CMR 20, prevented consideration by the convening authority of matters outside the record of trial. See also United States v. Gordon, 2 USCMA 632, 10 CMR 130. The answer to this contention was furnished by an Army board of review in United States v. Pratts-Luciano [CM 370895], 15 CMR 481:

"We distinguish this case from United States v. Duffy (No. 1404), 3 USCMA 20, 11 CMR 20, which was vigorously urged by the defense as requiring reversal. In the *Duffy* case it positively appeared that evidence outside the record was utilized to affirm the conviction, whereas in this case it positively appears that evidence outside the record was considered only as a possible basis for disapproval and the conviction was approved solely on the evidence of record. In the *Duffy* case the accused was deprived of the review guaranteed him by the *Code* and *Manual*. In this case he was accorded that review in full. He should not complain that his case was given more consideration than the *Code* and *Manual* guarantee."

The board of review further noted appropriately:

" 'In acting on the findings and sentence of a court-martial, the convening authority shall approve only such findings of guilty, and the sentence or such part or amount of the sentence, as he finds correct in law and fact *and as he in his discretion determines should be approved*' (UCMJ, Art 64) (italics supplied). That is to say, we believe, that the authority of a convening authority *to approve* findings and sentence is conditioned by the evidence of record and the law of the case, whereas his authority *to disapprove* is conditioned only by his discretion. Where, as in this case, there is brought to the attention of a staff judge advocate a matter extraneous to the record that indicates disapproval may be warranted in the interests of justice, it is the staff judge advocate's duty to cause the matter to be investigated and reported to the convening authority with appropriate advice. The fact that his advice with respect to the extraneous

matter may be adverse to the accused does not impeach his recommendation and the pursuant action of the convening authority on the record of trial proper. To hold otherwise would be to circumscribe the convening authority in the exercise of his discretion under Article 64 of the *Code* and and would induce, rather than prevent, miscarriages of justice."

The staff judge advocate also relied for his conclusion on United States v. Whitman, 3 USCMA 179, 11 CMR 179. In that case, evidence outside the formal record was relied on by a *board of review* for the benefit of the accused. This we held to be error—for the reason that a board of review is given under Article 66 no power to disapprove "in . . . [its] discretion." On the other hand, a convening authority is specifically granted such power, and cannot lawfully be advised to the contrary by his staff judge advocate.

In the interest of completeness—perhaps even of clarity—United States v. Walters, 4 USCMA 617, 16 CMR 191, should be mentioned in the present connection. That case involved an interpretation of whether certain items constituted parts of the record of trial. If parts of the record, it was required that they be weighed for prejudice to the accused—by both the convening authority and the board of review. We found them to have been included. However, this is not to say that, had we held them to fall outside the record of trial, they could not lawfully have been considered by the convening authority in determining whether "in his discretion" he should approve any or all of the findings and part or all of the sentence.

Two final comments are required. One is in answer to the staff judge advocate's characterization ▮ of the Government's as "not a close case"—in fact as a "compelling" and "overwhelming" one. This description must have been designed—honestly of course—to create in the convening authority the impression that Lieutenant Massey was so clearly shown to have been guilty that it was pointless to consider the possibil-

ity of heeding "lie detector" examinations or "truth serum" results. Our own careful examination of the entire record of trial scarcely supports this evaluation. Indeed, the court-martial displayed unmistakably its difficulty with the prosecution's "compelling," even "overwhelming," evidence (1) by recalling all of the Government's chief witnesses for further extensive and detailed examination, (2) by seeking additional instructions from the law officer, (3) by deliberating for what in a clear case is—within our experience—an unusually lengthy period of time, and (4) by acquitting the accused ultimately of one of the specifications lodged against him. We are sure that the preceding comment disposes fully of the suggestion that the accused here could not have been prejudiced by the staff judge advocate's erroneous advice. We find it quite conceivable that a convening authority—after noting the difficulty experienced by the members of the court-martial *in the absence* of the results of the "lie detector" and sodium pentothal interviews—might well have determined, in view of those results, to set aside the findings.

Government appellate counsel have argued that, when construed as a whole, the staff judge advocate's ▮ advice did, in fact, allow the convening authority to consider the results of the out-of-court investigations, but permissibly informed him that the weight to be accorded them was not such as to justify overturning the findings of guilt returned by the court. We do not at all deny that a staff judge advocate—in the course of his review of a case—may express his own conclusions with respect to the weight of evidence submitted at the trial, together with the import of matters learned from sources outside the record. Nor may the accused justly complain if that evaluation of evidence or information is adverse to him. United States v. Pratts-Luciano, supra. Moreover, a staff judge advocate may allowably go further—indeed to the point of informing a convening authority that he believes it would constitute an abuse of discretion to grant substantial weight to evidence secured and pre-

522

sented extrajudicially. The line of legality is distinctly passed, however, when the staff judge advocate's review creates in the mind of the convening authority the impression that he would *err in law* if he were to go outside the formal record of trial for the purpose of determining his action on findings and sentence.

After a perusal of the present review as a whole, we are unsure that this line was not passed in the case at bar. In short, the accused may well have failed to receive the benefit of a conscious exercise of discretion by the convening authority on the effect, if any, the latter desired to grant to available "lie detector" and "truth serum" results—evidence of which was inadmissible at the trial.[3] Under such circumstances, we are required to remand the case for further consideration by the convening authority, in light of the principles provided by this opinion. Cf. United States v. Moreno, 5 USCMA 500, 18 CMR 124; United States v. Doherty, 5 USCMA 287, 17 CMR 287. In the interest of fairness, the case should be remanded to an officer other than him who convened the present court-martial. Of course, this officer will be completely free to approve any or all findings and the sentence, to order a rehearing under the charges, or to dismiss.

## VI

The record of trial is remanded to The Judge Advocate General, United States Army, for further proceedings in accordance with this opinion.

Chief Judge QUINN and Judge LATIMER concur.

---

[3] It has been suggested that the accused was prejudiced as to possible clemency by the advice of the staff judge advocate to the convening authority to the effect that the results of the "lie detector" and sodium pentothal interviews were not to be considered. We must reject this argument—for the reason that the results of those extrajudicial tests were relevant only to the accused's guilt or innocence, and clemency action may not permissibly be predicated on a doubt of guilt. If there is such doubt, the findings should be disapproved. Dismissal was the only punishment imposed on the accused. If he be deemed guilty of the acts alleged, it is inconceivable that he would be retained in the service. While an administrative discharge may be substituted for the dismissal of an officer, this cannot be effected by the convening authority. See Article 74(a), Uniform Code.