UNITED STATES, Appellee

v

PETER R. WOOD, Specialist Four, U. S. Army, Appellant

*Major Franklin D. Arness* argued the cause for Appellant, Accused. With him on the brief was *Colonel Arnold I. Melnick.*

*Captain William C. Kirk* argued the cause for Appellee, United States. With him on the brief were *Lieutenant Colonel Ronald M. Holdaway, Lieutenant Colonel Donald W. Hansen,* and *Captain Richard A. Karre.*

## OPINION OF THE COURT

QUINN, Judge:

Remarks by the military judge during sentence proceedings are challenged on this appeal as bringing about deprivation of effective assistance of counsel as to the sentence.

After a 39(a) session with the judge of a general court-martial to which two charges involving a controlled substance had been referred to trial, the accused entered into an agreement with the convening authority to plead guilty. The convening authority agreed that as to the sentence imposed by the court-martial, he would approve no punishment in excess of a bad-conduct discharge (suspended), confinement at hard labor for 1 year, and forfeiture of all pay and allowances. As a result, when the case came on for hearing, the accused entered a plea of guilty. During sentence proceedings, he testified in his own behalf. He related his family and military background, referred to a desire to attend medical school after completing his service as a medic, and represented that the occasion was the first time he had ever had any trouble in the military. He attributed his involvement to the need to "make . . . money quickly" to ease the "pretty bad financial bind" he was in. He testified further as follows:

Q: [I]s there anything that you . . . [have] to say to . . . [the court members], what do you want, what would you like . . . [them] to do?
A: I'd like for them to give me a fair sentence.

Q: Do you want a dishonorable discharge?
A: No, sir.

Q: Why?
A: Because all my life I've had plans of trying to get into medical school and I came into the Army enlisting to be a medic so when I get out I can go to college and a bad discharge would end all hopes of being able to get into medical school.

Q: Is that really what you want?
A: Yes, sir.

Q: If you had the choice between a dishonorable discharge and no time in jail or five years in jail and no dishonorable discharge, which one would you take?
A: I'd take the five years in jail.

.    .    .    .    .

Q: Do you want to stay in the United States Army and fill out your term of enlistment?
A: Yes, sir.

Q: How would you feel if you went home with a dishonorable discharge?
A: It would be the end of my life because I wouldn't have the chance to fulfill any of my dreams or hopes and probably wouldn't ever make anything of myself.

Certain other testimony by the ac-

cused was regarded by the judge to be inconsistent with the plea of guilty. Excusing the court members, he held a hearing on the matter. Satisfied as to that matter, he turned to the part of the accused's testimony quoted above. He maintained the testimony was "not true" because there was "no way" the accused could "get five years in jail" in view of the plea agreement with the convening authority. The judge denounced defense counsel and the accused for "attempting to perpetrate" a "fraud" on the court members. Defense counsel protested the charge and suggested that the form of his questioning may have been due to "ineptitude," but he had no purpose to deceive. The accused also protested the denunciation. He asserted that he had discussed the sentence for 2 months with counsel, and if he was confronted with a choice between "five years in jail or dishonorable discharge, regardless of the pretrial agreement . . . [he] would take the five years in jail." Asked for his view of the matter, trial counsel replied that he did not regard the accused's testimony as a fraud on the court members.

Although unconvinced that accused was not attempting to deceive the court, the judge concluded he would "let the record stand just the way it is." Defense counsel asked leave to examine the accused further "along these lines" before the court members. In response, the trial judge observed he "didn't think" there was "any point" in insisting upon his view, as trial counsel had no objection, and defense counsel could, therefore, do as he requested. The final exchange between them was as follows:

MJ: Well you can but I don't think there is any point in pursuing it right now as long as the trial counsel does not want to pursue it. It would seem to me that you are better off with his testimony right the way it stands, on the acceptance of confinement as distinguished from a discharge.

IDC: Yes, your honor.

MJ: As far as I'm concerned the record ought to stay just exactly the way it is at this point. Now if you want to do it, of course, I'm not going to stop you but I don't think you ought to.

IDC: No, your honor.

MJ: All right, that takes care of that.

On recall of the court members, trial counsel briefly questioned the accused. Other witnesses then testified in the accused's behalf. A commissioned officer testified the accused had worked for him on various occasions and, in his opinion, the accused was "usually the hardest worker;" he maintained he would be willing "to take . . . [the accused] back" despite his commission of the offenses to which he had pleaded guilty. Two noncommissioned officers testified essentially to the same effect.

In his final argument to the court members as to the sentence, defense counsel contended that the case was not the "ordinary run of the mill dope selling case." He checked off accused's record and the testimony of the witnesses in his behalf. Commenting on the specifics of punishment, he asked the court to consider that the accused had confessed his wrong and in effect had said, "[H]ere I am, I don't want a dishonorable discharge." Referring to confinement, he just asked the court members to consider "if it would be wise to confine" the accused. He implored the court members to act with "mercy and wisdom" and to judge the accused "fairly."

The trial judge instructed the court members that the maximum punishment included dishonorable discharge and confinement at hard labor for 5 years, but they were "at liberty to arrive at any lesser legal sentence." He reviewed the evidence that they could consider, including "everything that the accused . . . said." The court members imposed a sentence of dishonorable discharge, forfeiture of all pay and allowances, reduction to Private E-1, and confinement at hard labor for 2 years. Thereafter, the convening authority reduced the sentence to conform to the limits provided in his agreement with the accused.

On review, the accused charged that the trial judge had improperly castigated him and his counsel "for trying to chisel on the pretrial agreement with the convening authority." The Court of Military Review gave specificity to the charge by

calling for briefs on the question of whether the judge's remarks had inhibited defense counsel from arguing for an appropriate sentence in terms of the accused's "views about the relative severity of different punishments." By divided vote, the court decided the issue against the accused. The two judges constituting the majority reached the result in different ways. One regarded the defense presentation as an attempt to *"tradeoff"* more confinement for a *"worse discharge"* than provided in the agreement, and he concluded that such an endeavor by defense counsel was unethical because it tended to mislead the court members "into believing that the accused may be permitted to serve the entire five years . . . when he is aware that if such a sentence is imposed his client will not serve" it because of the agreement. The second member of the court majority, like the trial judge, perceived the accused's testimony as a "hoodwinking" of the court members. Alluding to the "basic philosophy" of the military system of plea negotiations, the dissenting judge was of the opinion that a plea agreement did not deny the accused any "right during the sentencing portion of his trial that he would have had in a contested case;" he concluded that the trial judge's remarks had inhibited defense counsel in his sentence argument to the court members.

Agreements on a plea and sentence are common in both the military and civilian criminal practice, but the military procedure has no counterpart in the civilian community. In civilian practice, the prosecutor agrees with the defendant to recommend to the judge a particular sentence. The agreement binds the prosecutor to make the recommendation, but neither the agreement nor the recommendation binds the judge to impose that sentence, although usually he will accept the recommendation. See United States v Watkins, 11 USCMA 611, 29 CMR 427 (1960); Santobello v New York, 404 US 257 (1971). Sometimes, the judge may participate directly in the plea arrangement; depending upon the extent of his participation, he may become committed to impose a sentence no more severe than that indicated in the arrangement. In both situations, the sentencing judge knows and takes account of the pretrial agreement. This is not true in the military practice. In the military, the accused's plea agreement is with the convening authority. The convening authority has important functions in the court-martial process, but he does not possess the primary power, as does the civilian judge, to determine guilt and to impose sentence; that power is vested in the court-martial. See United States v Brice, 17 USCMA 336, 38 CMR 134 (1967); United States v Allen, 8 USCMA 504, 507, 25 CMR 8, 11 (1957). The convening authority can prevent a court-martial from acting on charges against the accused by not referring them to trial; he can completely negate findings of guilty determined by a court-martial and the sentence adjudged by it by disapproval of its action, Article 64, Uniform Code of Military Justice, 10 USC § 864; United States v Massey, 5 USCMA 514, 18 CMR 138 (1955), but he cannot command a court-martial to act as he desires.

Elimination of command control upon a court-martial was one of the major objectives of the Uniform Code of Military Justice, and this Court has been acutely sensitive to its appearance in any guise. The imperative of elimination of improper command control does not deny the convening authority powers conferred upon him by the Uniform Code. As the convening authority can, in reviewing a conviction by court-martial, reduce or entirely disapprove the findings of guilty and the sentence adjudged by the court, we deemed it appropriate and proper for him, in the interests of the accused and the military justice system, to agree with the accused in advance of trial as to the limits of the findings and sentence he would approve, if the accused enter a plea of guilty before the court-martial. United States v Watkins, supra. At the same time, we recognized the need to be vigilant against improper command influence on the court-martial or overbearing of the accused in effectuation of the agreement. See United States v Cummings, 7 USCMA 376, 38 CMR 174 (1968); United States v Welker, 8 USCMA 647, 25 CMR 151 (1958).

All the argument castigating accused's

testimony as a fraud upon the court members is premised on the idea that the accused's testimony was contrary to the binding nature of the agreement with the convening authority. As Government counsel in this case put it, the agreement's "terms dictate the absolute maximum punishment which the accused can receive," and for defense counsel and the accused to have implied otherwise at trial was an "outright" falsehood. Strangely, none of the argument suggests that, as the agreement also binds the convening authority, it should obligate the trial judge to instruct the court members the maximum punishment is as provided by the agreement, not what is prescribed by law. In United States v Sanchez, 40 CMR 698, 699 (ABR 1969), Government counsel argued before the Court of Military Review that the " 'provisions of a pretrial agreement . . . are irrelevant in determining the maximum sentence imposable by the court-martial.' " Here, counsel also reject the idea that "the members of a court should be informed as a matter of course what maximum sentence an accused may receive as a result of his pretrial agreement." If it is right as a matter of law for the Government to disregard the agreement when instructing the court members as to the limits of sentence, is it not equally right for the accused to disregard the agreement in his argument as to the kind of sentence that should be adjudged? To allow the Government the right to disregard the agreement so that the sentence will be determined on the basis of the maximum punishment allowed by law increases the likelihood that the adjudged sentence will not be less than that provided by the agreement; to deny the accused the right to disregard the agreement in making his case before the court increases the likelihood even more. One is impelled to ask whether such one-sided application of the agreement is fair. *Cf.* Wardius v Oregon, 412 US 470 (1973).

■A pretrial agreement has the effect of reducing the maximum legal punishment in that it obligates the convening authority to approve no more severe a sentence than that provided in the agreement. United States v Brice, supra. As we pointed out earlier, however, the agreement is with the convening authority and it controls his action when reviewing the findings and sentence determined by the court-martial, but the agreement cannot influence the sentence to be adjudged by the court-martial. As the principal opinion in *Watkins* observed, the agreement leaves the accused "unbridled," and allows him to "bring before the court-martial members any fact or circumstance which might influence them to lessen the punishment." 11 USCMA at 615-16, 29 CMR at 431-32.

■ In United States v Villa, 19 USCMA 564, 42 CMR 166 (1970), we considered the question of command influence upon a judge sitting without court members, resulting from his knowledge of the sentence terms of a plea agreement between the accused and the convening authority. We concluded that the training and experience of a judge gave reasonable assurance he knew and understood that the circumstances which led to the plea agreement might be factually and materially different from the matters presented for sentence consideration at trial; as a result, he was not likely to disregard his own judgment as to a fair sentence and accept the sentence provided in the agreement because of fear of "derogating the power and the position of the convening authority." *Id.* at 567, 42 CMR at 169. These considerations do not obtain when sentence is imposed by the court members. The probable likelihood is that knowledge of the sentence provisions of the agreement by the convening authority would incline the court members to abstain from imposing a less severe sentence than that set out in the agreement to avoid conflict with the convening authority. See United States v Johnson, 14 USCMA 548, 34 CMR 328 (1964); United States v Pinkney, 22 USCMA 595, 48 CMR 219 (1974); United States v Massie, 45 CMR 717 (ACMR 1972), *pet. denied,* 21 USCMA 647, 45 CMR 928 (1972); United States v Montes, 44 CMR 784, 785 (NCMR 1971).

■ Whether sentence is imposed by the judge alone or by the court members, the determination is not on the basis of the limits provided in the agreement, but as provided by law. The judge or

court members, as the case may be, can impose a more severe sentence than provided by the agreement or a more lenient sentence. As far as the trial is concerned, therefore, the Government can, as it did here, disregard the agreement and require the court members to determine the sentence on the basis of the maximum penalty prescribed by law. The accused can disregard the agreement by trying to convince the judge or court members that he is worthy of greater leniency. True, an aura of unreality is imparted to the procedure if the adjudged sentence is greater than provided in the agreement, since that sentence will have to be reduced by the convening authority. We commented on that circumstance in the *Villa* case, 19 USCMA at 566, 42 CMR at 169; see also United States v Montes, supra. However, the agreement does not, and cannot prevent the court from adjudging a less severe sentence. As a result, we have admonished defense counsel that, while he may draw "practical comforts" from his knowledge of the terms of a previous agreement with the convening authority, when he goes to court he must do all he can to obtain the court's independent judgment as to what constitutes a fair sentence for the accused.

■ *Allen* contemplates no restraint upon a defense plea for leniency from the court-martial because of the existence of an agreement with the convening authority. Both *Allen* and *Villa* caution that the factors that may have produced the agreement can be substantially different from those prevailing at trial. In *Pinkney,* 22 USCMA at 597-98, 48 CMR at 221-22, we said, "So long as military law makes provisions for plea bargaining . . . the legitimate use . . . [of the procedure] is antithetical to any attempt . . . to turn . . . [its] use against the accused." We are certain that defense counsel's conduct and the accused's testimony were entirely consistent with the decision and import of these cases. We conclude, therefore, that the trial judge and the Court of Military Review erred in characterizing accused's testimony and defense counsel's conduct as a fraud upon the court members.

■ We turn now to the effect of the judge's remarks. Notwithstanding his sharp and severe criticism, the judge told defense counsel he would allow the accused's testimony to stand, and he would not prevent argument by counsel consistent with that testimony. Writing in dissent in the Court of Military Review, Judge Donahue concluded from the nature of defense counsel's argument that he was inhibited from "making an appropriate argument" in terms of the accused's testimony. Events since the court's disposition of the accused's case make it unnecessary for us to analyze the defense argument. There is an order in the record which provided for remission of the punitive discharge on October 1, 1973; there is no indication that remission has not been accomplished, as directed. Remission of a discharge is tantamount to its disapproval and obviates the need for proceedings to correct its improper imposition. United States v Cieslak, 13 USCMA 216, 32 CMR 216 (1962). We can, therefore, affirm the decision of the Court of Military Review, despite the erroneous nature of the reasons for its action, and return the record of trial to the Judge Advocate General of the Army, "secure in the knowledge that the purpose of accused's appeal has been achieved." United States v Anderson, 14 USCMA 515, 516, 34 CMR 295, 296 (1964).

Chief Judge DUNCAN and Senior Judge FERGUSON concur.