UNITED STATES

v.

**Airman Basic William P. SCHMIT, FR 574–56–1901 United States Air Force.**

**ACM S25297 (f rev).**

U. S. Air Force Court of Military Review.

Sentence Adjudged 6 April 1981.

Decided 14 May 1982.

Appellate Counsel for the Accused: Colonel George R. Stevens and Captain Douglas H. Kohrt.

Appellate Counsel for the United States: Colonel James P. Porter and Major George D. Cato.

Before HODGSON, POWELL, and MILLER, Appellate Military Judges.

DECISION UPON FURTHER REVIEW

MILLER, Judge:

Pursuant to his pleas, the accused was convicted by special court-martial, military judge alone, of absence without leave, twice willfully damaging military property, unlawful entry, and both use and possession of marijuana on divers occasions, in violation of Articles 86, 108, and 134, Uniform Code of Military Justice (UCMJ), 10 U.S.C. §§ 886, 908, and 934. His sentence consists of a bad conduct discharge, confinement at

hard labor for five months, and forfeiture of $334.00 per month for five months.

Following initial consideration of this case, we returned the record of trial to The Judge Advocate General of the Air Force for a proper authentication by the military judge, and, those new actions and the review required as a consequence thereof.[1] We also noted in that decision that unless the convening authority in his new action either suspended or eliminated the bad conduct discharge originally ordered into execution, an additional issue would remain for subsequent resolution. The additional issue was whether the convening authority's designation in his action of the 3320th Correction and Rehabilitation Squadron, Lowry Air Force Base, Colorado (3320th CRS) as the accused's place of confinement constituted an irrevocable grant of clemency on his part.

As returned to us, the new actions of the convening and supervisory authorities, although affirming the sentence as before, both deleted any reference whatsoever to a designated place of confinement (the portion of the accused's sentence relating to confinement had already expired). No suspension or elimination of the bad conduct discharge was included in either. Consequently, the issue noted in our original opinion is now ripe for consideration.

After reviewing the facts of the instant case and referencing Air Force Regulations, we examine both the nature of the 3320th CRS and the regulatory effect of convening authority actions designating it as a "place of confinement." Finally, we analyze both the congressional intent behind Article 64, UCMJ, 10 U.S.C. § 864, and judicial decisions addressing the scope of convening authority sentence amelioration powers under that Article. We conclude that, here, the convening authority's designation of the 3320th CRS as an accused's place of confinement in his court-martial action was a proper exercise of Article 64, UCMJ, sentence amelioration powers. Accordingly, since the accused was improperly denied the benefit of his convening authority's decision

granting him another opportunity to prove his worth to the Air Force so that, if successful, he might continue on active duty until his honorable discharge, we set aside the bad conduct discharge.

## I

Following the accused's trial and prior to the initial action of the convening authority, the accused requested a formal clemency interview.

Based upon the accused's presentation at this interview, (it included a personal expression of the accused's concerns and a voluntary request for entry into the "return to duty rehabilitation" (RTDR) program conducted by the 3320th CRS), the post-trial clemency evaluation officer found that the accused possessed "outstanding" potential for rehabilitation and recommended his transfer to the 3320th CRS, for immediate entry into the RTDR program. Additionally, the post-trial clemency evaluation officer's report not only contained a recommendation from the accused's commander that the accused's discharge be suspended, but recommendations from the presiding military judge at the accused's trial and the accused's first sergeant, flight chief, immediate supervisor, trainer, and confinement NCOIC that the accused be immediately entered into the 3320th CRS. A mental health evaluation diagnosing the accused as victimized by a personality disorder basically untreatable within the Air Force was the report's sole document militating against clemency.

Although not referenced in the clemency evaluation officer's report, it is clear from a second report, authored by the accused's pre-trial confinement hearing officer, that the convening authority was also aware that following the accused's arrest he had cooperated with Government efforts to prosecute individuals in related cases. The clemency evaluation officer's report did indicate that the accused was transferred for his own safety from the confinement facility at Travis Air Force Base, California to

---

1. This return was accomplished by an unpublished decision dated 15 October 1981.

the confinement facility at Mather Air Force Base, California on 6 April 1981.

On 29 May 1981, the special court-martial convening authority, having personally considered all of this clemency information, approved the sentence as adjudged. Significantly, as a part of this action, he also designated the 3320th CRS as the accused's place of confinement.

On 31 July 1981, the supervisory authority approved the sentence. In doing so, however, pursuant to advice provided him by his staff judge advocate, he changed the designated place of confinement from the 3320th CRS to the base detention facility, Travis Air Force Base, California, citing paragraph 97d, MCM, as authority for this action.[2]

The advice of the staff judge advocate upon which the supervisory authority based his action, while thoroughly referencing the recommendations contained in the clemency evaluation officer's report, did not acknowledge the fact that under Air Force Manual 111–1, Military Justice Guide, 2 July 1973, the convening authority's designation of the 3320th CRS as the accused's place of confinement reflected a positive decision on his part that the accused should be afforded the additional chance to prove his worth to service and country, offered by entry into the 3320th's RTDR program. Nor, did the advice suggest that, had the accused not cooperated with the government in other pending prosecutions (thereby necessitating a delay in the immediate execution of the transfer to the 3320th required by AFM 111–1), the supervisory authority would have been powerless to effect a change in the place of confinement because by the

time he took his action, that place would have been a *fait accompli*.[3]

II

Our examination of the nature of the 3320th CRS and the regulatory effect of convening authority actions that designate it as a place of confinement is based upon our scrutiny of Air Force Regulation 125–18, Operation of Air Force Correction and Detention Facilities, 1 February 1980, and AFM 111–1.

The purpose of the Air Force's RTDR program at Lowry Air Force Base, Colorado, is to provide certain airmen sentenced to punitive discharges an additional chance to prove their worth to their service and their country, by affording them the opportunity to be returned to productive active duty assignments. AFR 125–18, para. 8–1. Established by AFR 125–18,[4] this program is limited to airmen, who the convening authority determines are both eligible[5] and good candidates (possess exceptional restoration potential) for return to duty. AFR 125–18, para. 5–8. A convening authority's decision to enter an airman into this program is effectuated by an order that the airman be transferred to the 3320th CRS. AFR 125–18, para. 5–8. Prior to issuing such an order, the convening authority must determine that the affected airman will voluntarily participate in the program. AFR 125–18, para. 5–8a.

Air Force Manual 111–1, the document which provides Air Force guidance concerning post-trial review procedures, requires that all orders effecting the transfer of

---

2. Although not specifically stated in the record, from the allied papers (specifically, a 10 August 1981 memo regarding excess leave from the base staff judge advocate to the convening authority) it appears that the only reason the accused had not actually been transferred pursuant to the convening authority's action to the 3320th Correction and Rehabilitation Squadron, Lowry Air Force Base, Colorado (3320th CRS), prior to the action of the supervisory authority was that the government anticipated a need for him to testify as a government witness in a court-martial scheduled for 20 August 1981.

3. *See*, note 2, *supra*.

4. For information detailing the mission, concept, operation, administration and rehabilitation procedures offered by this program, see Air Force Regulation 125–18, Operation of Air Force Correction and Detention Facilities, 1 February 1980, Chapter 8.

5. For eligibility requirements see AFR 125–18, para. 5–8, generally.

prisoners to the 3320th CRS, be incorporated into the action of the convening (supervisory) authority. Specifically it provides that actions on prisoners selected by the convening (supervisory) authority for the 3320th CRS, should contain:

"The 3320th CRS, Lowry AFB CO 80230 is designated as the place of confinement, and the confinement will be served therein or elsewhere as competent authority may direct."

AFM 111–1, para. 7–19d(3).

Actions on prisoners sentenced to punitive discharges not selected by convening (supervisory) authorities for the 3320th CRS are to bear the legend:

"The Confinement Facility, Fort Riley KS 66442, is designated as the place of confinement, and the confinement will be served therein or elsewhere as competent authority may direct."

AFM 111–1, para. 7–19d(3).

AFM 111–1, para. 7–19d(4) provides:

Unless exceptions are made for good reason, all prisoners sent to the 3320th CRS enter the RTDR program.

■ When an accused is awarded a bad conduct discharge by any special court-martial, AFM 111–1, para. 7–5, requires the staff judge advocate of the accused's special court-martial convening authority to: (1) obtain post-trial clemency evaluations from individuals occupying certain specified positions whose occupants are likely to have knowledge of the accused's rehabilitation potential; (2) provide the accused an opportunity to comment on these evaluations and to present any other clemency matters he desires the reviewing authorities to consider; and (3) provide the accused an opportunity for a formal clemency interview with a judge advocate representing the special court-martial convening authority. When these tasks are completed, the staff judge advocate is required to provide the special court-martial convening authority with all clemency materials thus gathered. The special court-martial convening authority must then carefully consider all of them, prior to taking any action on the accused's record of trial, (AFM 111–1, para. 7–5 and 7–19, and AFR 125–18, para. 5–8).

Foremost among the clemency materials gathered by the staff judge advocate for a convening authority's consideration are the written clemency evaluations (AF Forms 138) he is required to obtain from the accused's commander, first sergeant, chaplain, supervisors, and any others who might be expected to have first-hand knowledge of the accused's restoration potential (see specifically, paragraph 7–5b). Each of these individuals, pursuant to instructions contained on the AF Form 138, is required to: (1) indicate the "type and amount of clemency recommended (i.e., suspension of discharge, reduction in length of confinement, change in form of punishment, etc.)," if any; (2) individually evaluate the "accused's rehabilitation potential and future value to the Air Force" and, (3) affirmatively indicate whether or not he or she "recommend[s] that the accused be transferred to the 3320th Retraining Group, Lowry AFB for immediate entry into the retraining program. (This is in distinction to transfer for confinement and screening.)"

Additionally, at the accused's request, a judge advocate must conduct a formal clemency interview with the accused. AFM 111–1, para. 7–5g and 7–5h. This report usually contains an "evaluation of the accused's potential for clemency or rehabilitation." AFM 111–1, para. 7–5i. During this interview, the judge advocate conducting the interview is also required to familiarize the accused with the operation and functions of the 3320th CRS and to affirmatively ascertain from the accused, whether or not he or she is a volunteer for entry into the rehabilitation program offered by assignment to that Squadron. AFM 111–1, para. 7–5h.

Although the clemency evaluation form, itself, appears to draw some tentative distinction between clemency, on the one hand, and potential for restoration to duty on the other, any such distinction is obscured by the cautionary language of AFM 111–1, para. 7–19d(5):

There is no policy prohibiting the suspension of a punitive discharge when prisoners are transferred to the 3320th CRS... On the other hand, suspension of the discharge for one sent to the 3320th CRS will make disposition difficult if the prisoner fails to meet the restoration criteria and even more difficult if no good cause later exists for vacation proceedings under Article 72.... This has a demoralizing effect on other prisoners who must demonstrate by good conduct, efficiency and attitude their worthiness of restoration to duty...

A prisoner's entry into the 3320th CRS is likely not only to shorten his period of confinement (AFR 125–18, para. 8–4); but to constitute a more beneficial and pleasant experience than would confinement at any other detention facility. AFR 125–18, para. 8–7a(1). In actuality, then, a restored prisoner, sentenced to 11 months confinement at hard labor, who returns to duty after having successfully completed the 3320th's RTDR program in 90 days of the relatively pleasant environment at Lowry, receives far greater sentence amelioration than a restored prisoner, who, having had a punitive discharge immediately suspended, serves eight months of an eleven month sentence confined at hard labor in a local detention facility. As will be seen in Section III, *infra*, the sentencing amelioration power Congress has granted convening authorities under Article 64, UCMJ, is subject to no such restrictive definitions of the term "clemency" that are arbitrarily created by any service's forms or regulations.

### III

Article 64, UCMJ, grants convening authorities acting on the findings and sentence of a court-martial the power to approve only so much of a sentence they in their discretion determine should be approved. Article 71(d), 10 U.S.C. § 871(d) grants convening authorities the power to suspend the execution of any sentence, except a death sentence.

The following quotations taken from Congressional hearings and floor debates concerning the enactment of Article 64, clearly demonstrate that Congress intended this article to bestow, upon the convening authority, an absolutely unfettered power to ameliorate, in any manner and for any or no reason, any sentence imposed by a court-martial he or she convened.

*First.* Congressman Mendel Rivers enumerating what he considered to be the four most notable rights the proposed new Code would guarantee to members of the armed forces, stated:

> The appointing authority reviews the sentence of every court with full right to reduce the sentence in any amount, even to the extent of dismissing the case.

*Congressional Floor Debate on the Uniform Code of Military Justice*, Navy—DPPO 9ND, Great Lakes, Ill., at p. 32.

*Second.* Mr. Larkin, one of the Code's principal draftsmen, opined:

> [Article 64] was intended to give him [the convening authority] a free hand in doing anything he wants for any reason in cutting down the sentence or in disapproving it.

*Hearings before the House Committee on Armed Services, 81st Congress, 1st Session, on H.R. 2498*, pages 1182–1183

*Third.* A colloquy involving Mr. Larkin and other members of the House Committee on Armed Services, expressed the following views:

> Mr. BROOKS. He [the convening authority] doesn't have to read the record or anything esle (sic). He can just say disapproved and it is through.
>
> Mr. LARKIN. That is right. In the normal course of review of the case he looks to its legality and the establishment of the facts and the appropriateness of the sentence and he shouldn't approve anything that is wrong or illegal, but he can disapprove it if it is illegal, if it is wrong, and for any other reason.
>
> Mr. BROOKS. Or for no reason at all?
>
> Mr. LARKIN. Or for no reason at all.
>
> Mr. RIVERS. That is right.
>
> Mr. LARKIN. The classic case that I think General Eisenhower stated in his

testimony before your subcommittee last year was that even though you might have a case where a man is convicted and it is a legal conviction and it is sustainable, that man may have such a unique value and may be of such importance in a certain circumstance in a war area that the commanding officer may say "Well he did it all right and they proved it all right, but I need him and I want him and I am just going to bust this case because I want to send him on this special mission."

*House Hearing, supra,* p. 1184. (*See, United States v. Massey,* 5 U.S.C.M.A. 514, 520, 18 C.M.R. 138, 144 (1955))

*Fourth.* A later colloquy between committee members during the same committee hearings expressed these opinions:

Mr. SMART. Yes, Sir.

Now, article 64, on page 51. The point there was that the committee wanted to be sure that the convening authority had the right to remit any part of the sentence he wanted to, that is, to do anything he desired with that sentence, so far as abating it was concerned.

So I would suggest on page 51, at line 17, immediately before the word 'determines' at the end of line 17, insert 'as he in his discretion,' so that he is not limited to the findings or sentence or anything else but his discretion.

It becomes a discretionary matter with the convening authority as to what he shall do with any sentence which comes before him for review.

Mr. BROOKS. Any objection to that verbiage? If not, we will adopt that.

*House Hearing, supra,* at 1266. *See, United States v. Russo,* 11 U.S.C.M.A. 352, 358, 29 C.M.R. 168, 174 (1960).

Certainly, regardless of the terms Congress may have used to describe this bold new "power" of convening authorities or "right" of servicemen, parallels drawn between this new conceptual "power" or "right" and congressional or executive "clemency" in civilian cases were to become inevitable.

The drafters of the Manual for Courts-Martial, United States, 1969, (Rev.) avoided using the term "clemency" in specifying types of abating actions that convening authorities could properly take in modifying sentences as a result of UCMJ Article 64, para. 88, MCM. Nevertheless, they did assert that the decisions of convening authorities concerning the exercise of such actions were to be based upon a consideration of all matters relating to "clemency," including the possibility of "rehabilitation." para. 88 *b*, MCM.

The United States Court of Military Appeals, first addressed the "power" of convening authorities or "right" of servicemen created by Article 64, UCMJ, *albeit* somewhat indirectly, in *United States v. Simmons,* 2 U.S.C.M.A. 105, 6 C.M.R. 105 (1952). There, as in most subsequent cases dealing with Article 64, the issue was whether a service board of review had power under Article 66, 10 U.S.C. § 866 similar to that vested in convening authorities under Article 64 to ameliorate a sentence by taking some specific type of action. The Court stated that at first impression it seemed boards of review should possess a convening authority's power to suspend a sentence, and pointed out the apparent anomoly presented by any holding that, while boards possess the power to remit punitive discharges entirely, they do not possess the power to suspend these discharges for probationary periods. The Court, nevertheless, found service boards of review did lack such authority.

The Court's rationale for this decision included the fact that "Article 66 of the Code ... carefully restricts the boards of review to action 'on the basis of the entire record.'" According to the Court, since the "entire record" did not include the accused's prior record nor reflect the accused's personal characteristics, the board possessed insufficient information upon which to evaluate the possibility of rehabilitating an accused as a worthwhile member of the service. As the possibility of such rehabilitation is the sole justification for suspension of a punitive discharge, and, "Evaluation of rehabilitative possibilities must depend in

large part on the accused's prior record and personal characteristics," *United States v. Simmons, supra,* at 106, the Court determined that boards of review are in no position to second guess convening authorities, who possess such information, on decisions regarding suspensions of disciplinary discharges.

Two years later the Court in *United States v. Coulter,* 3 U.S.C.M.A. 657, 14 C.M.R. 75 (1954), again indirectly commented on the nature of the convening authority's power to ameliorate sentences under Article 64, UCMJ. Here, it re-emphasized the convening authority's unique accessibility to matters "outside" the record by stating, "The accused's best chance for sentence reduction, within the courts-martial processes, comes in the [Article 64, UCMJ] initial review," *United States v. Coulter, supra,* at 660, 78.

Coincidently, *Coulter, supra,* resulted in reversal, because a staff judge advocate, who had acted as trial counsel, advised his convening authority against following recommendations of a clemency evaluation report that an accused's discharge be suspended so he could be confined at an Air Force retraining center, with a view toward possible return to effective duty.

Although falling short of actually stating that Article 64 provides a convening authority congressional or executive type "clemency" powers, the Court strongly implied that it does in *United States v. Lanford,* 6 U.S.C.M.A. 371, 20 C.M.R. 87 (1955). Here in comparing sentence amelioration powers of the convening authority and boards of review, the Court first noted that it had not previously precluded a description of the sentencing powers of boards of review as a clemency power. It then stated:

> Clemency is defined as the "Disposition to treat with less rigor than one's authority or power permits; mercy." Webster's New International Dictionary, 2d ed. page 501. The general power to exercise clemency belongs to the sovereign.
>
> \* \* \* \* \* \*
>
> Insofar as offenses against the United States are concerned, the power to exer-

cise clemency belongs to Congress, subject to the right of the President to "grant Reprieves and Pardons... except in Cases of Impeachment." United States Constitution, Article II, section 2; *United States v. Goodwin,* 5 U.S.C.M.A. 647, 18 C.M.R. 271. In the Uniform Code Congress gave designated authorities certain discretionary powers in regard to sentences imposed by courts-martial. To the convening authority, Congress gave the power to "approve ... the sentence or such part or amount ... as he in his discretion determines should be approved." Article 64, Uniform Code of Military Justice, 50 U.S.C. 651.

*United States v. Lanford, supra,* at p. 380, 96.

*United States v. Wise,* 6 U.S.C.M.A. 472, 20 C.M.R. 188 (1955) was the first case in which the Court clearly recognized that providing an accused sentenced to a punitive discharge with an opportunity to redeem himself in his military service constituted sentence amelioration. Quoting from the opinion:

> Article 64 ... places an important duty squarely on the shoulders of the convening authority... [H]e is directed to affirm only such sentence, or such part or amount of the sentence as he finds correct in law or fact, and as he in his discretion determines should be approved.
>
> \* \* \* \* \* \*

[Manual] Paragraph 88e(2)(b) carries out the idea that each person convicted of a crime should be weighed individually to determine his potential for redeeming himself. It states:

> ... If the approved sentence involves a dishonorable or bad conduct discharge and confinement, the convening authority may determine that the execution of the punitive discharge should be suspended to the end that the accused may have the opportunity of redeeming himself in the military service, but that the execution of the confinement should not be suspended. In such a case, he may suspend the execution of

the punitive discharge until the release of the accused from confinement, or for a definite period thereafter, and provide in his action for the automatic remission of the suspended sentence...

\* \* \* \* \* \*

[A]n accused is entitled as a matter of right to a careful and individualized review of his sentence at the level of the convening authority. It is his first and perhaps best opportunity to have his sentence tempered by mercy and to obtain an additional chance to prove his worth to his service and his country.

*United States v. Wise, supra*, 190–193.

Paraphrasing the principles enunciated by the Court of Military Review in *Simmons* and *Wise*, both *supra*, an anomaly exists if a convening authority possesses the power to suspend or remit a disciplinary discharge entirely, but does not possess the power to provide an apparently worthy accused, sentenced to such a disciplinary discharge, an additional chance to prove his worth to his service and his country by directing his entry into a special "rehabilitation" program specifically designed to enable him to prove such future worth. If such an anamoly exists, it is particularly conspicuous because the convening authority, more than any other reviewing authority, has immediate access to those factors from "outside" the record that are critical to the individualized and honest evaluation of the potential for such rehabilitation, to which every accused is entitled.

Although, the Court in *United States v. Freeman*, 4 U.S.C.M.A. 76, 15 C.M.R. 76 (1954) and *United States v. Goodwin*, 5 U.S. C.M.A. 647, 18 C.M.R. 271 (1955) had possibly implied that a convening authority might be restricted in ameliorating the severity of sentences to actions authorized under Paragraph 88, MCM, the Court in 1962, after specifically noting those two decisions, extensively reviewed all of its previous decisions and enunciated the following principles, as controlling in all instances of sentence amelioration:

First, and most importantly, we have consistently emphasized that we here deal with the power of the convening authority, and the board of review to make a determination regarding the appropriateness of a particular sentence with due regard to the accused and the crimes of which he has been convicted. Congress did not think it wise to attach labels to this process, for attempts so to classify changes in sentences tend to bring into play technical niceties and narrowly based distinctions which are completely at odds with the legislative intent to have the sentence reassessed at various levels until it fits the particular offender. In short, Congress desired intermediate appellate authorities to look again at the penalty adjudged and reduce the severity of its impact until it was deemed appropriate.

\* \* \* \* \* \*

Finally, in each case, it was clearly indicated that the convening authority and the board of review, in taking such action with respect to the sentence, must thereby lessen its severity. It is axiomatic that exercise of appellate authority on the sentence may not increase its impact and if the change in form of penalty is to be equally damaging, it would follow that there was no need to alter the sentence, for that adjudged would logically be as appropriate as that sought to be imposed on appeal.... [N]either the convening authority nor the board of review may change the nature of a penalty merely because that sought to be approved is administratively more convenient, [the change must in fact ameliorate the severity of the court-martial sentence].

*United States v. Johnson*, 12 U.S.C.M.A. 640, 643, 31 C.M.R. 226, 229 (1962).

The last decision of the Court of Military Appeals, impacting on our decision here, contained that Court's only comments to date concerning the nature of a retraining or rehabilitation group similar to the one in which the convening authority, here, directed that the accused be permitted to participate. In *United States v. Bennett*, 18 U.S. C.M.A. 96, 39 C.M.R. 96 (1969), the Court held that the failure of the advice of a staff

judge advocate to inform a supervisory authority that he "had the power to commute a bad conduct discharge to a period of confinement thus qualifying the accused for the program at the retraining group as recommended," constituted prejudicial error.

In the appellate process, the post-trial review and the action of the convening (supervisory) authority is oftentimes the most critical step of all because of the broad powers granted this authority by Article 64, Code, supra. It is while at this level that an accused stands the best opportunity of having his sentence tempered by mercy and to obtain an additional chance to prove his worth to his service and his country. Since the convening authority in large part depends upon the assistance of his legal advisor (Articles 60 and 61, Code, supra) in this regard, the post-trial review is of vital importance.

* * * * * *

To the extent that he informed the officer exercising general court-martial authority that the "recommendations of the clemency evaluations make a persuasive argument for designation of the 3320th Retraining Group as a place of confinement," but "(un)fortunately the accused lacks sufficient remaining time in confinement to make him eligible for the program," the Acting Staff Judge Advocate correctly fulfilled his function. However, his use of the word "unfortunately" is of concern to us for the meaning is not clear. If he meant, thereby, as urged by the defense, that the supervisory authority had no alternative but to decline to follow the recommendations for rehabilitation, he was in error, for a proper authority may commute a punitive discharge to some lesser sentence, including additional confinement and forfeitures. Had this been done, the accused would have qualified for retraining ... We are uncertain as to its meaning.

* * * * * *

The record is silent as to whether the power of commutation was ever considered by either the Acting Staff Judge Advocate or the officer exercising general court-martial jurisdiction. In view of the strong recommendations for rehabilitation by the Noncommissioned Officer in Charge of the Dover Detention Facility and the Prisoner Disposition Board, commutation [so as to have permitted the accused's entry into this program] would seem to have been particularly appropriate in this case.

*United States v. Bennett, supra,* 98–99, 98–99.

Although the Court, in *Bennett,* did not explicitly find that a convening authority's designation in his action of the 3320th CRS as an accused's place of confinement was a proper exercise of his Article 64 sentence amelioration powers, such a finding is manifestly implicit in its holding. For absent such a finding, the staff judge advocate's failure to advise his convening authority that he had the authority to commute the accused's bad conduct discharge into an additional period of confinement thereby extending the accused's period of confinement sufficiently to allow designation in the convening authority's action of the 3320th CRS as the accused's place of confinement, would have constituted non-prejudicial error.

■ Based upon our analysis of Air Force regulations, Congressional intent, and *stare decisis,* we are convinced that the Court's implicit finding in *Bennett,* was correct. We, therefore, hold that under current Air Force regulations, the convening authority's designation of the 3320th CRS, Lowry Air Force Base, Colorado, as the accused's place of confinement in his action on the court-martial record constituted a proper exercise of his sentence amelioration powers under Article 64, UCMJ.

■ Although the opportunity for the accused to prove his worth that was granted by this action would have been fulfilled immediately upon his transfer to the 3320th CRS, (i.e., once there the 3320th CRS could have made any appropriate disposition of the accused permitted by its governing regulations), absent some evidence prior to his

transfer that the accused had, subsequent to the convening authority's action, engaged in conduct demonstrating his unworthiness to participate in the 3320th's RTDR program, his transfer should have been effected. *Compare, United States v. Krenn*, 12 M.J. 594 (A.C.M.R.1981).

Because there was no evidence of subsequent misconduct, the accused was denied a benefit granted to him by his convening authority pursuant to Article 64, UCMJ. Since this benefit consisted of an additional opportunity to prove his worth to his service and his country, we disapprove the bad conduct discharge.

The findings of guilty and so much of the accused's sentence as provides for confinement at hard labor for five months and forfeiture of $334.00 per month for five months is affirmed. The bad conduct discharge is set aside.

HODGSON, Chief Judge, and POWELL, Senior Judge, concur.