**UNITED STATES**

v.

**Airman Gary W. HELTON, FR 032–44–2619 United States Air Force.**

**ACM S24834.**

U. S. Air Force Court of Military Review.

Sentence Adjudged 18 Sept. 1979.

Decided 17 March 1981.

Appellate Counsel for the Accused: Colonel Larry G. Stephens and Captain Willard K. Lockwood.

Appellate Counsel for the United States: Colonel James P. Porter and Captain James R. Van Orsdol.

Before EARLY, POWELL and MAHONEY, Appellate Military Judges.

## DECISION

MAHONEY, Judge:

The accused was tried by special court-martial, military judge alone. Despite his pleas, he was found guilty of two possessions and one sale of marihuana, in violation of Article 134, Uniform Code of Military Justice, 10 U.S.C. § 934. The approved sentence extends to a bad conduct discharge, confinement at hard labor for four months, and reduction to airman basic.

We address three issues raised by appellate defense counsel. In the first, appellate government counsel concede that the military judge erred in determining that one witness was not an accomplice. We agree, but find no prejudice. In the other two, we disagree with the claims that the military judge erred in considering the results of a marihuana field-test, and in refusing to require the presence of a polygraph operator as a defense expert witness.

I. *Failure to Rule Witness was an Accomplice.* The prosecution called an Airman Basic Wessels to testify concerning three of the seven charged offenses. As frequently occurs in drug prosecutions, Airman Wessels' chief qualification as material witness was his own extensive involvement in illicit drugs. Some three months prior to the accused's trial, Wessels himself was convicted of possession and sale of marihuana.[1] During the course of the investigation preceding his trial, Wessels provided authorities with drug-related information on 37 other persons, including the accused. As a result of his cooperation with law enforcement authorities, Wessels received a reduction in the length of his confinement, and a suspension of his bad conduct discharge. At the time of the accused's trial, Wessels entertained hope for restoration of one or more of the stripes taken from him by sentence of his court-martial, but he had received no promises in exchange for his testimony at the accused's trial.

Concerning the alleged sale and possession of marihuana offenses,[2] Airman Wessels testified that on one occasion during March or April, 1979, he went to the accused's barracks room to purchase marihuana. The accused presented him a grocery sack containing from 12 to 20 plastic bags, which in turn contained what the accused represented to be marihuana. After satisfying himself that the substance was marihuana, Wessels selected and purchased two of the bags, for purposes of wrongful use and transfer. Wessels' testimony was the only evidence supporting those findings of guilty.

Prior to announcing general findings, the military judge found specially[3] that Airman Wessels was not an accomplice to either the possession or sale offense. Government counsel appropriately concede that the military judge erred with respect to the sale offense. As a necessary party to the illegal transaction, a purchaser who is aware of the contraband nature of the substance is an accomplice to the wrongful sale. *United States v. Scoles*, 14 U.S.C.M.A. 14, 33 C.M.R. 226 (1963); *United States v. McCue*, 3 M.J. 509 (A.F.C.M.R.1977); *United States v. Petrie*, 40 C.M.R. 991 (A.F.B.R. 1964).[4]

Since Airman Wessels was an uncorroborated accomplice to the sale allegation, the military judge, as fact-finder, was required to reject his testimony concerning that specification, if such testimony was uncertain, improbable, or self-contradictory. We have examined that testimony in our own role as fact-finders, Article 66(c), Uniform Code of Military Justice, 10 U.S.C. § 866(c), and find it to have been certain, believable, and consistent. Hence, we are satisfied that the military judge's error of law did not result in prejudice to the accused. *United States v. Diaz*, 22 U.S.C. M.A. 52, 46 C.M.R. 52 (1972).[5] Moreover, in

---

1. See *United States v. Wessels*, 8 M.J. 747 (A.F.C.M.R.1980).

2. The third charged offense about which Wessels testified was an alleged attempt to sell amphetamines. The facts related by Wessels established only preparatory acts, insufficient in law to constitute an attempt. Appropriately, the military judge entered a finding of not guilty to that charge and specification.

3. The defense request for special findings was properly made to preserve for the record the law applied by the military judge sitting alone. Paragraph 74*i*, Manual for Courts-Martial, 1969 (Rev.).

4. Airman Wessels did not fall within the exception recognized for those acting in a law enforcement capacity, or at the direction of law enforcement agents. *United States v. Hand*, 8

M.J. 701 (A.F.C.M.R.1980); *United States v. Kelker*, 50 C.M.R. 410 (A.C.M.R.1975).

5. We do not consider the matters affecting Airman Wessels' credibility so pervasive as to require setting aside the finding of guilty, particularly when the questions of fact were determined by a military judge experienced in assessing the credibility of witnesses. In cases considering the absence of an accomplice instruction to court members, we have affirmed, *United States v. Westmoreland*, 1 M.J. 706 (A.F.C.M.R.1975), *rev'd on other grounds*, 4 M.J. 91 (C.M.A.1977), or reversed, *United States v. Moore*, 2 M.J. 749 (A.F.C.M.R.1977); *United States v. Baker*, 2 M.J. 360 (A.F.C.M.R. 1977), based upon our assessment of the weight and importance of the purchaser's testimony.

view of Airman Wessels' obvious self-interest, particularly in regard to his hope for further clemency, we have considered his testimony with great caution, as no doubt did the trial judge. Despite such caution, and notwithstanding the accused's denial under oath, we are convinced of his guilt beyond any reasonable doubt.

■ II. *Results of Marihuana Field-Test.* The record indicates that Special Agent Miller, Air Force Office of Special Investigations, was qualified by training and experience to identify marihuana by odor and appearance. Based upon his observation of the vegetable substance seized during a consensual search of the accused's barracks room, Agent Miller opined that the substance was marihuana. He confirmed his opinion as to the identity of the substance by performing a field-test, which gave a positive reaction for presence of the active ingredient in marihuana. In his testimony, Agent Miller acknowledged that such a field-test is not conclusive for the identification of marihuana.[6]

In *United States v. Sanchez,* 50 C.M.R. 450 (A.F.C.M.R.1975), we considered the admissibility of the same type field-test used here. We adhere to our conclusion in *Sanchez* that the results of such field-tests are properly admissible in evidence in support of the opinion of a person qualified by training and experience to identify marihuana.[7] *See,* Mil.R.Evid. 702, 703, and 705. The military judge did not err in considering the field-test result as a part of the evidence bearing upon the identification of the substance seized from the accused's room, and admitted against him at trial.

■ III. *Results of Polygraph Testing.* Appellate defense counsel urge that the military judge erred in refusing the accused's request for the presence of a particular polygraph operator as a defense witness. In an offer of proof, trial defense counsel indicated that the polygraph operator would testify that, in his opinion as a certified polygraph operator, the accused was truthful in denying culpability as to some, but not all, of the offenses of which he stands convicted. We hold that the military judge acted properly in precluding evidence of the results of polygraph testing, and in precluding any attempt to establish a foundation for its admissibility. *United States v. Ledlow,* 11 U.S.C.M.A. 659, 29 C.M.R. 475 (1960); *United States v. Massey,* 5 U.S.C.M.A. 514, 18 C.M.R. 138 (1955). *See,* paragraph 142e, Manual for Courts-Martial, 1969 (Rev.).[8] *See also, United States v. Masri,* 547 F.2d 932 (5th Cir. 1977), *cert. den.,* 434 U.S. 907, 98 S.Ct. 309, 54 L.Ed.2d 195 (1977).

The basic premise of the polygraph procedure is the theory that there exist certain "involuntary" human physiological functions which will, when properly monitored, measured, and recorded, enable a trained polygraph operator to reliably detect attempts at deception in response to controlled questions.[9] The polygraph device

---

6. The field-test kit, manufactured by Becton, Dickinson and Company, is a pre-packaged Duquenois Reagent (modified) color test which screens for the trace presence of cannabinoids, the physiologically active component of marihuana. *See, United States v. Sanchez,* 50 C.M.R. 450, 452–455 (A.F.C.M.R.1975).

7. Since our decision in *United States v. Sanchez, supra,* the Court of Military Appeals has held that an in-court demonstration of the field-test, on an unidentified substance in no way connected with the accused, constituted prejudicial error. *United States v. Pjecha,* 7 M.J. 455 (C.M.A.1979). None of those facts are present in this case, and our decision in *Sanchez* was cited with approval in *Pjecha.*

8. This case was tried prior to the effective date (1 September 1980), of the Military Rules of Evidence. Paragraph 142e, Manual for Courts-Martial 1969 (Rev.), in effect at the time of trial, but deleted in the adoption of the Military Rules of Evidence, prohibited the admission in evidence of the results of a polygraph test. The former Manual proscription was based upon the military precedent cited in the text. *Air Force Summary of Changes in the Manual for Courts-Martial, 1969.*

9. The polygraph operator's opinion is based upon observations of the subject's outward behavior (popularly referred to as "body language"), and evaluation of the graphs produced by the polygraph instrument. To the extent there is a "lie-detector", it is the polygraph operator, not the polygraph instrument.

monitors and records on a graph several physiological activities of the subject's body, most commonly the rate of respiration, the blood pressure, and the electroconductivity of the skin (galvanic skin response). Certain variations in those physiological activities, during controlled questioning, are claimed to result from attempts at deception by the subject.[10]

The landmark starting point for judicial consideration of polygraph test results is the case of *Fyre v. United States*, 293 F. 1013 (App.D.C.1923), which sustained the trial judge's exclusion of opinion testimony based upon recorded changes in the accused's systolic blood pressure during ques-

tioning about the crime.[11] In the 57 years since that decision the polygraph device has been greatly improved in terms of sensitivity and precision; comprehensive training and certification programs have been developed for operators; and the theory upon which the validity of the procedure rests has been stated in far more sophisticated terms. Yet, the theory remains basically the same, and subject to considerable dispute among experts in the relevant scientific fields. In the field of behavioral science, for example, recent evidence has brought into serious question the basic premise that the monitored physiological activities are "involuntary."[12]

10. The validity of the polygraph procedure is dependent upon a complex combination of theory, precision measurement technique, and subjective interpretation. From the formulation of a deceptive response in the mind of the subject, to a valid conclusion of "deception" by the polygraph operator, there are at least nine essential steps:

[1] (Theory). Formulation of a deceptive response, particularly with knowledge of polygraph monitoring, causes psychological conflict in the subject;

[2] (Theory). Such psychological conflict, including anxiety and fear of detection, causes mental stress;

[3] (Theory). Such mental stress causes physiological changes in the subject;

[4] (Theory). Those physiological changes are not under the volitional control of the subject (or, to the extent they are, the exercise of volitional control will be detected, and properly considered by the polygraph operator);

[5] (Technique). The physiological changes are detected and recorded by the polygraph instrument;

[6] (Technique). The polygraph instrument establishes norm for the monitored and recorded physiological activities, and accurately portrays deviations from that norm;

[7] (Interpretation). The deviations portrayed on the graph can be reliably interpreted in terms of relative stress at any point in questioning;

[8] (Interpretation). The questions asked and the test environment are devoid of bias or conditions extraneous to the issue which might invalidate the interpretation; and

[9] (Interpretation). The polygraph operator's evaluation of the graph deviations, and observation of the subject's outward behavior, enable him to render a reliable opinion that deception was (or was not) being attempted by the subject in response to a question. *See generally, Polygraph Control and Civil Liberties Protection Act: Hearings on S. 1845 Before the*

*Subcomm. on the Constitution of the Senate Comm. on the Judiciary*, 95th Cong., 1st & 2d Sess. (1977–78); *The Use of Polygraph and Similar Devices by Federal Agencies: Hearings Before a Subcomm. of the House Comm. on Government Operations*, 93d Cong., 2d Sess. (1974); Inbau & Reid, *The Lie Detector Technique: A Reliable and Valuable Investigative Aid*, 50 A.B.A.J. 470 (1964); Burkey, *The Case Against the Polygraph*, 51 A.B.A.J. 855 (1965); Skolnick, *Scientific Theory and Scientific Evidence; An Analysis of Lie Detection*, 70 Yale L.J. 694 (1961).

11. Speaking for the Court, Associate Justice Van Orsdel stated the oft-quoted test:

Just when a scientific principle or discovery crosses the line between the experimental and demonstrable stages is difficult to define. Somewhere in this twilight zone the evidential force of the principle must be recognized, and while courts will go a long way in admitting expert testimony deduced from a well-recognized scientific principle or discovery, the thing from which the deduction is made must be sufficiently established to have gained general acceptance in the particular field in which it belongs.

*Fyre v. United States*, 293 F. 1013, 1014 (App. D.C.1923).

12. One study concluded that "In theory, it is possible to bring under volitional control any physiologic process that can be continuously monitored and reported back to the patient." Corcoran & Wilson, *Biofeedback Conditioned Responses and the Polygraph: A Case Report*, 8 J.Am. Polygraph Assn. 120, 123 (1979). An earlier study in this area concluded that "trained subjects were able to deceive the [polygraph] operator and remain undetected at a statistically significant level ..." Corcoran, Lewis & Garver, *Biofeedback-Conditioned Galvanic Skin Response and Hypnotic Suppression*

The opinion testimony of polygraph operators is subject to diverse claims as to its reliability. Confirmation is difficult in real-life cases, and the validity of controlled experiments is subject to dispute.[13] Moreover, there is a dearth of studies comparing the reliability of polygraph opinion evidence with the reliability of the fact-finder at a court-martial. In determining the ultimate issue of guilt or innocence, it is the function of the fact-finder to hear and observe the witness; to weigh that testimony against all other evidence in the case; and to assess its truthfulness in light of human experience and knowledge of the ways of the world. Until it can be demonstrated that the opinion testimony resulting from polygraph testing is generally more reliable than the court-martial fact-finder in determining truthfulness, it cannot be determined that such evidence will aid the court in performance of its function, Mil.R.Evid. 702, and hence that it is relevant. Mil.R. Evid. 401.[14]

■ In view of the foregoing, we are satisfied that there exists no reason at this time to reevaluate military precedent prohibiting the receipt in evidence of the results of polygraph testing. Not only does such evidence fail to meet the relevance requirements of Mil.R.Evid. 401, but there also exist sound policy reasons to preclude the admission of polygraph results at trial. One is the inordinate amount of judicial time required to be expended in establishing a foundation for its admissibility;[15] the other is the undue weight which will be attached to such evidence, if admitted. See, Mil.R.Evid. 403. The aura of scientific precision, whether or not valid, will inevitably surround the polygraph operator's opinion of a witness' veracity.[16]

*of Arousal: A Pilot Study of Their Relation to Deception*, 23 J. Forensic Sciences 155, 161 (1978).

**13.** The polygraph is, however, widely used as an investigative technique. *See, Hearings*, note 10, *supra*, and Air Force Regulation 124–15, Conduct of Polygraph Examinations within the Department of the Air Force and the Selection, Training, Certification, and Supervision of USAF Polygraph Examiners, 18 June 1976.

**14.** There is little doubt that a properly certified polygraph operator may be qualified as an expert in his field under Mil.R.Evid. 702. However, expertise in the polygraph operation is not in issue until a preliminary determination has been made that the opinion of the polygraph operator meets the test of relevancy. Mil.R.Evid. 401. That issue must be resolved by experts in those fields of scientific endeavor essential to establish the validity of the theory upon which the polygraph procedure is based. At a minimum, testimony of qualified experts in the medical and human behavioral sciences is required. *United States v. Alexander*, 526 F.2d 161 (8th Cir. 1965). For a recent overview of the federal cases, *see* Annot., *Modern Status of Rule Relating to Admission of Results of Lie Detector (Polygraph) Tests in Federal Criminal Trials*, 43 A.L.R.Fed. 68 (1979).

**15.** District Judge William P. Gray's Memorandum concerning his experience in hearing three day's of unsuccessful foundational evidence is particularly instructive on this point. *United States v. Urquidez*, 356 F.Supp. 1363 (C.D.Ca. 1973). In order for the results of a particular polygraph examination to be considered relevant as evidence, it must be established not only that the theory has gained general scientific acceptance, but also that the particular instrument, operator, and testing procedure did not deviate from acceptable standards in the polygraph field. The underlying question of relevance is for the court's determination, Mil. R.Evid. 401, and cannot be avoided even by stipulation of the parties. *See, State v. Biddle*, 599 S.W.2d 182 (S.Ct.Mo. *en banc*, 1980). The expenditure of time, and digression from the issues in the case, is compounded to the extent that there is polygraph opinion testimony concerning the veracity of more than one witness, or that there is conflicting polygraph opinion testimony. Mil.R.Evid. 403.

**16.** Presented with conflicting and unreconcilable evidence, the temptation would be great for the court to defer to the opinion of the polygraph examiner, and abrogate its factfinding responsibility. The presence of such opinion evidence in any case will tend to obscure the fact that the truthfulness of a witness' testimony is purely subjective, and frequently unrelated to the ultimate and objective facts which must be determined by the court. *United States v. Alexander*, 526 F.2d 161, 165 (8th Cir. 1965). Three brief examples are illustrative of the problem: an "innocent" accused may lie about his whereabouts merely to avoid having to explain his presence at the scene of a crime; an "eyewitness" may testify truthfully about his observations, even though he misperceived the events; and a "guilty" accused may have so rationalized his actions as to "truthfully" deny complicity in the offense.

We have considered the remaining assignments of error and resolved them adversely to the accused. The findings of guilty and the sentence are correct in fact and law and, on the basis of the entire record, are

AFFIRMED.

EARLY, Chief Judge, and POWELL, Senior Judge, concur.