**UNITED STATES**

v.

**Airman Edward G. SCHEFFER, FR554–85–0300, United States Air Force.**

**ACM 30304.**

U.S. Air Force Court of Criminal Appeals.

Sentence Adjudged 17 Oct. 1992.

Decided 5 Jan. 1995.

EN BANC DIXON, SNYDER,
RAICHLE, HEIMBURG, YOUNG,
PEARSON, SCHREIER, GAMBOA, and
BECKER, JJ.

### OPINION OF THE COURT

YOUNG, Judge:

Contrary to his pleas, appellant was convicted of making and uttering 17 checks, totaling over $3,300, without sufficient funds in his account, wrongfully using methamphetamine, failing to go to his appointed place of duty, and a 13–day unauthorized absence. Articles 123a, 112a, and 86, UCMJ, 10 U.S.C. §§ 923a, 912a, 886 (1988). Court members sentenced him to a bad-conduct discharge, confinement for 30 months, total forfeitures, and reduction to E–1. Appellant assigns three errors: (1) the military judge erred by refusing to admit into evidence the results of appellant's exculpatory polygraph examination; (2) the charges should have been dismissed for lack of a speedy trial; and (3) appellant is entitled to 5 days credit because his pretrial confinement was not reviewed by a neutral and detached magistrate within 48 hours of incarceration. We order appellant be given credit for 1 day of illegal pretrial confinement. We find no error which affects the findings or sentence.

### I. Admissibility of Polygraph Results

#### A. Facts

Appellant, apparently on his own initiative, agreed to assist the Air Force Office of Special Investigations (AFOSI) with drug investigations. His AFOSI handlers advised appellant that from time to time they would ask him to provide urine specimens to be tested for drugs and to submit to polygraph examinations. On 7 April 1992, AFOSI Special Agent Shilaikis asked appellant if he would consent to a urinalysis. Appellant agreed, but declined to provide a urine sample until the following day. He claimed he only urinated one time a day, and he had already done so. He asked for, and received, permission to continue his undercover work that evening. The following day, he provided a urine specimen. On 10 April 1992, appellant took an AFOSI polygraph. During the ex-

Appellate Counsel for Appellant: Colonel Terry J. Woodhouse, Colonel Jay L. Cohen, Lieutenant Colonel Frank J. Spinner, and Captain Del Grissom.

Appellate Counsel for the United States: Colonel Jeffery T. Infelise and Captain Jane M.E. Peterson.

amination, appellant answered "no" to the following relevant questions:

(1) Since you've been in the AF, have you used any illegal drugs?

(2) Have you lied about any of the drug information you've given OSI?

(3) Besides your parents, have you told anyone you're assisting OSI?

The examiner opined that appellant's polygraph charts "indicated no deception to the above questions." On approximately 14 May 1992, the AFOSI agents learned appellant's urine specimen had tested positive for methamphetamine.

## B. The Issue

At trial, appellant moved to admit the results of the polygraph despite the proscription of Mil.R.Evid. 707; the prosecution objected. The military judge ruled that the Constitution did not prohibit the President from promulgating a rule excluding polygraph evidence from admission in trials by courts-martial, and he denied appellant's request to lay a foundation for its admission. Appellant testified on his own behalf and denied knowingly using methamphetamine.

Mil.R.Evid. 707 provides:

(a) Notwithstanding any other provision of law, the results of a polygraph examination, the opinion of a polygraph examiner, or any reference to an offer to take, failure to take, or taking of a polygraph examination, shall not be admitted into evidence.

(b) Nothing in this section is intended to exclude from evidence statements made during a polygraph examination which are otherwise admissible.

According to the drafters' analysis, Mil. R.Evid. 707 is based on the following policy grounds: (1) the "danger court members will be misled by polygraph evidence that 'is likely to be shrouded with an aura of near infallibility'" (quoting *United States v. Alexander,* 526 F.2d 161, 168–69 (8th Cir.1975)); (2) "to the extent that the members accept polygraph evidence as unimpeachable or conclusive, despite cautionary instructions from the military judge, the members' 'traditional responsibility to collectively ascertain the facts and adjudge guilt or innocence is preempted'" (*Id.*); (3) the danger of confusion of the issues which "could result in the court-martial degenerating into a trial of the polygraph machine"; (4) presentation of polygraph evidence "can result in a substantial waste of time when collateral issues regarding the reliability of the particular test and qualifications of the specific polygraph examiner must be litigated in every case"; (5) "[t]he reliability of polygraph evidence has not been sufficiently established and its use at trial impinges upon the integrity of the judicial system." *Manual for Courts–Martial, United States, 1984,* App. 22 at A22–46 (1994 ed.); *see United States v. Helton,* 10 M.J. 820 n. 10 (A.F.C.M.R.1981) (concise description of the complex combination of theory, precise measurement techniques, and subjective interpretation required to support validity of polygraph).

## C. Presidential Authority to Promulgate Mil.R.Evid. 707(a)

The Constitution vests in Congress the power to make rules "for the Government and Regulation of the land and naval forces." U.S. Const. art. I, § 8, cl. 14. The Constitution also gives Congress the power to make all laws necessary to execute this power. U.S. Const. art. I, § 8, cl. 18. Congress executed this power by enacting the Uniform Code of Military Justice (UCMJ). In the UCMJ, Congress delegated to the President the authority to prescribe the modes of proof before trials by courts-martial, "in regulations, which shall, so far as he considers practicable, apply the principles of law and the rules of evidence generally recognized in the trial of criminal cases in the United States district courts, but which may not be contrary to or inconsistent with [the UCMJ]." Article 36(a), UCMJ, 10 U.S.C. § 836(a) (1994). Article 36(a) is unquestionably a valid Congressional delegation. *See United States v. Smith,* 13 U.S.C.M.A. 105, 32 C.M.R. 105, 118–19, 1962 WL 4459 (1962); *accord United States v. Weiss,* 36 M.J. 224, 238 (C.M.A.1992) (Crawford, J., concurring in the result), *aff'd,* — U.S. ——, 114 S.Ct. 752, 127 L.Ed.2d 1 (1994).

Pursuant to Article 36(a), UCMJ, the President promulgated Mil.R.Evid. 707, and the

Manual for Courts–Martial in which it is found. *See* Exec.Order No. 12,767, 56 Fed. Reg. 30,284 (1991). Thus, the question we must resolve is rather narrow in scope. It is not whether polygraph examinations should be admissible in trials by courts-martial, but whether the President may constitutionally prohibit their admission.

 " '[O]ne of the first principles of constitutional adjudication [is the] basic presumption of the constitutional validity of a duly enacted state or federal law.' " *Lemon v. Kurtzman,* 411 U.S. 192, 208, 93 S.Ct. 1463, 1473, 36 L.Ed.2d 151 (1973) (quoting *San Antonio School District v. Rodriguez,* 411 U.S. 1, 60, 93 S.Ct. 1278, 1311, 36 L.Ed.2d 16 (1973) (Stewart, J., concurring)). We must accord Mil.R.Evid. 707, and all other provisions of the Manual for Courts–Martial, the force of law, unless it conflicts with the UCMJ. *Noyd v. Bond,* 395 U.S. 683, 692, 89 S.Ct. 1876, 1882, 23 L.Ed.2d 631 (1969); *Smith,* 32 C.M.R. at 119. Accordingly, we will not declare Mil.R.Evid. 707(a) unconstitutional in the absence of a clear showing that the President exceeded the discretionary powers conferred upon him by Article 36(a). *United States v. White,* 3 U.S.C.M.A. 666, 14 C.M.R. 84, 88, 1954 WL 2095 (1954).

### D. The Rights to Due Process and Compulsory Process

 Military members are afforded the protections guaranteed by the United States Constitution, except for those which are expressly or by necessary implication inapplicable. *United States v. Stombaugh,* 40 M.J. 208, 211–12 (C.M.A.1994). Both the right to due process under the Fifth Amendment and the right to compulsory process under the Sixth Amendment apply to service members at courts-martial. *Stombaugh,* 40 M.J. at 212; *United States v. Graf,* 35 M.J. 450, 454 (C.M.A.1992), *cert. den.,* —— U.S. ——, 114 S.Ct. 917, 127 L.Ed.2d 206 (1994).

 The Supreme Court has held that evidence is constitutionally required if it is relevant, material, and favorable to the defense. *United States v. Valenzuela–Bernal,* 458 U.S. 858, 867, 102 S.Ct. 3440, 3446, 73 L.Ed.2d 1193 (1982). The Court of Military Appeals has "unequivocally" adopted this holding for military cases. *United States v. Williams,* 37 M.J. 352, 361 (C.M.A.1993) (citing *United States v. Dorsey,* 16 M.J. 1 (C.M.A.1983)).

 The Military Rules of Evidence have combined the common law concepts of relevance and materiality into one rule of relevancy. *See* S. Saltzburg, L. Schinasi, & D. Schlueter, *Military Rules of Evidence Manual* 422 (3d ed. 1991).

"Relevant evidence means evidence having any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence." Mil.R.Evid. 401. But, in analyzing relevance, we still must confront two questions: (1) Does the evidence have any tendency to make the existence of any fact more or less probable?; and (2) Is that fact of consequence to a determination of appellant's guilt?

What "favorable to the defense" means has been the subject of varying opinions; however, the Supreme Court specifically rejected the "conceivable benefit" test. "If we require only a showing that a witness could provide some 'conceivable benefit' to the defense, then 'the number of situations which will satisfy this test is limited only by the imaginations of judges or defense counsel.' " *Williams,* 37 M.J. at 361 (Gierke, J., concurring) (quoting *Valenzuela–Bernal,* 458 U.S. at 866–67, 102 S.Ct. at 3446). It appears the Supreme Court requires that the evidence be "vital to the defense" when "evaluated in the context of the entire record." *Valenzuela–Bernal,* 458 U.S. at 867–68, 102 S.Ct. at 3446–47.

 "Of course, the right to present relevant testimony is not without limitation. The right 'may, in appropriate cases, bow to accommodate other legitimate interests in the criminal trial process.' " *Rock v. Arkansas,* 483 U.S. 44, 55, 107 S.Ct. 2704, 2711, 97 L.Ed.2d 37 (1987) (quoting *Chambers v. Mississippi,* 410 U.S. 284, 295, 93 S.Ct. 1038, 1046, 35 L.Ed.2d 297 (1973)). Procedural and evidentiary rules to control the presentation of evidence which are "designed to assure both fairness and reliability in the ascer-

tainment of guilt and innocence" are permissible. *Chambers*, 410 U.S. at 302, 93 S.Ct. at 1049; *see Washington v. Texas*, 388 U.S. 14, 23 n. 21, 87 S.Ct. 1920, 1925 n. 21, 18 L.Ed.2d 1019 (1967). But, when the rule denies or significantly diminishes appellant's right to present evidence or to confront and cross-examine the witnesses against him, the competing interests must be closely examined. *Chambers*, 410 U.S. at 295, 93 S.Ct. at 1046 (citing *Berger v. California*, 393 U.S. 314, 315, 89 S.Ct. 540, 541, 21 L.Ed.2d 508 (1969)). As *Rock, Chambers,* and *Washington* are the most relevant Supreme Court cases to this inquiry, we will examine them in some detail.

### E. The Case Law

Washington was convicted of murdering his former paramour's new boyfriend. Washington testified that a man named Fuller actually did the shooting and that he had tried to stop Fuller. Fuller, who had already been convicted of the murder, would have corroborated Washington's testimony, but his testimony was barred under Texas law. Two Texas statutes provided that persons charged or convicted as co-participants in the same crime could not testify for one another. The Supreme Court held that Washington was "denied his right to have compulsory process for obtaining witnesses in his favor because the State arbitrarily denied him the right to put on the stand a witness who was physically and mentally capable of testifying to events that he had personally observed, and whose testimony would have been relevant and material to the defense." *Washington*, 388 U.S. at 23, 87 S.Ct. at 1925. The exclusion of this testimony was clearly arbitrary because it applied only to the defense, did not apply if the accomplice had been acquitted at his own trial, and "leaves [the accomplice] free to testify when he has a great incentive to perjury, and bars his testimony in situations where he has a lesser motive to lie." *Id.*

Chambers was convicted of murdering a policeman, Officer Liberty. McDonald, who was at the scene of the shooting, provided Chambers' attorneys with a signed, sworn confession to shooting the policeman with his own pistol which he subsequently discarded.

McDonald also admitted to telling a friend that he had done the shooting. McDonald later repudiated his confession. At trial, a friend of McDonald testified that he saw McDonald shoot the victim. A cousin of the victim testified that right after the shooting he saw McDonald with a pistol in his hand. When the State chose not to call McDonald, Chambers did. McDonald admitted confessing to the murder and his written confession was introduced. On cross-examination by the State, McDonald stated that he had recanted, he did not commit the murder, and he had only confessed because of promises that he would not go to jail and would share in a sizable tort recovery. The judge denied Chamber's motion to examine McDonald as an adverse witness because the State's "voucher" rule prevented a party from impeaching its own witness.

Chambers called three of McDonald's friends to testify. Hardin testified that on the night of the murder, McDonald admitted killing the victim. The judge sustained the State's objection that the testimony was hearsay and told the jury to disregard it because the State did not recognize declarations against penal interests as an exception to the hearsay rule. Turner testified, contrary to McDonald, that he was not with McDonald at the time of the shooting. The judge sustained the prosecution's hearsay objection to Turner's testimony that McDonald had admitted shooting the victim and had later asked Turner not to implicate him in the murder. Carter had been McDonald's friend for about 25 years. The day after the murder, McDonald told Carter he had killed Officer Liberty and disposed of the weapon. The judge refused to permit Carter to testify before the jury. Thus, as a result of the "party witness" or "voucher" rule and the State's hearsay rule, Chambers was "unable either to cross-examine McDonald or to present witnesses in his own behalf who would have discredited McDonald's repudiation and demonstrated his complicity." *Chambers*, 410 U.S. at 294, 93 S.Ct. at 1045. The Supreme Court held that Chambers was denied a fair trial in violation of the Due Process Clause of the Fourteenth Amendment because (1) the application of the "voucher" rule deprived him of the opportunity to con-

tradict testimony that was clearly adverse, and (2) the trial judge erred by excluding reliable, corroborated, hearsay evidence critical to Chambers' defense. The Court made clear that such rules of evidence were not per se unconstitutional. They are unconstitutional only to the extent their application denies an accused a fair trial.

Rock shot her husband to death. When police arrived on the scene, Rock told them her husband had choked her and thrown her against the wall, she had picked up the pistol, appellant hit her again, and she shot him. Because she could not remember the exact details of the shooting, Rock's attorney suggested she submit to hypnosis in order to refresh her memory. During the two hypnosis sessions, Rock did not relate any new information; however, after the hypnosis, she remembered that her finger was not on the trigger, and the gun had discharged when her husband grabbed her arm during the scuffle. As a result, the pistol was examined by an expert who opined that the gun was defective and prone to fire when hit or dropped. The Arkansas rules of evidence barred all testimony that had been hypnotically refreshed. Upon motion by the prosecution, the judge limited Rock's testimony to the sketchy notes the hypnosis expert had made of her pre-hypnosis description of the shooting. The Supreme Court held that a per se rule which resulted in excluding the testimony of a hypnotically refreshed accused impermissibly infringed the right of an accused to testify on her own behalf. *Rock*, 483 U.S. at 62, 107 S.Ct. at 2714. The Court declined to express an opinion as to the constitutionality of a rule that would prohibit the hypnotically refreshed testimony of witnesses other than criminal defendants. *Rock*, 483 U.S. at 58 n. 15, 107 S.Ct. at 2712 n. 15.

■ In the early years of the UCMJ, the per se exclusion of polygraph evidence was established by case law. *See United States v. Massey*, 5 U.S.C.M.A. 514, 18 C.M.R. 138, 144, 1955 WL 3296 (1955); *United States v. Pryor*, 2 C.M.R. 365, 370–71, 1951 WL 2249 (A.B.R.1951). No doubt based on this early case law, the President prohibited the admission into evidence of conclusions based upon polygraph tests in the *Manual for Courts–Martial, United States, 1969 (Rev.)*, ¶ 142e. *See* Department of the Army Pamphlet 27–2, *Analysis of Contents, Manual for Courts–Martial, United States 1969, Revised Edition*, at 27–14 (1970). On 12 March 1980, the President substituted the Military Rules of Evidence for the evidentiary rules formerly contained in Chapter XXVII of the Manual for Courts–Martial. Exec.Order 12198, 45 Fed.Reg. 16,945 and 16,993 (1980). The new rules, based on the Federal Rules of Evidence, did not prohibit polygraph evidence and provided a new way of looking at expert evidence. *See United States v. Gipson*, 24 M.J. 246, 250–52 (C.M.A.1987); *accord Daubert v. Merrell Dow Pharmaceuticals, Inc.*, — U.S. ——, 113 S.Ct. 2786, 125 L.Ed.2d 469 (1993). Gone was the test of *Frye v. United States*, 293 F. 1013 (D.C.Cir.1923), which required the proponent of scientific evidence to establish, as a foundation, that the evidence was of a type generally accepted in the scientific community. In its place, the President promulgated Mil.R.Evid. 401, 402, 403, and 702. *See United States v. Rodriguez*, 37 M.J. 448 (C.M.A.1993); *Gipson*, 24 M.J. at 251. To be admissible, the scientific evidence must be relevant (Mil.R.Evid. 401 and 402); its probative value must not be "substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the members, or by considerations of undue delay, waste of time, or needless presentation of cumulative evidence" (Mil.R.Evid. 403); and must "assist the trier of fact to understand the evidence or to determine a fact in issue" (Mil.R.Evid. 702). Of course, in evaluating whether the evidence is probative and helpful to the fact finder, the military judge should consider the degree of acceptance in the scientific community. *Gipson*, 24 M.J. at 252.

In *Gipson*, the Court of Military Appeals divided scientific evidence into three classes: (1) evidence for which "the principles underlying the expertise are so judicially recognized that it is unnecessary to reestablish those principles in each and every case, such as fingerprint, ballistics, or x-ray evidence; (2) evidence for which the principles can neither be accepted nor rejected out of hand; and (3) evidence based on practices and techniques that "have been so universally dis-

credited that a trial judge may safely decline even to consider them, as a matter of law." *Gipson*, 24 M.J. at 249. The Court assigned the polygraph to the middle class and specified several reasons which precluded assigning it to the top class of scientific evidence: (1) criticism of the scientific principles on which the polygraph and the polygrapher's opinion is based; (2) the importance of the precision of the questions, the way the examiner intended them, and the examinee understood them; (3) the examinee's state of mind; and (4) other conditions such as whether the examinee was taking medications, illegal drugs, or attempting countermeasures to control the physical responses to be recorded by the polygraph. *Gipson*, 24 M.J. at 248–49; *see* 1 P. Giannelli & E. Imwinkelried, *Scientific Evidence*, § 8–3(A) (2d ed. 1993) (the authors' formulation of the issues: "the lack of empirical validation, the numerous uncontrollable factors involved in the examination, the subjective nature of the deception determination, and the absence of adequate standards for assessing the qualifications of examiners."); *Helton.*

Despite the Court's concerns, it held that polygraph evidence was not per se inadmissible and an accused is entitled to attempt to lay foundational predicates for its admission. Of course, admissibility would depend on the competence of the examiner, the suitability of the examinee, the nature of the particular testing process employed, and other factors. *Gipson*, 24 M.J. at 252–53. By adopting Mil.R.Evid. 707, the President overruled *Gipson* as it applied to polygraph evidence.

The President promulgated Mil.R.Evid. 707 on June 27, 1991, to apply to all cases in which arraignment had been completed on or after 6 July 1991. Exec. Order 12,767, 56 Fed.Reg. 30,284 (1991). The Army Court of Military Review is the only appellate court to have directly addressed the constitutionality of this rule. *See United States v. Williams*, 39 M.J. 555 (A.C.M.R.1994). In *Williams*, the accused admitted misappropriating three of eighteen unauthorized disbursements from the Chaplain's Fund and "passed" a polygraph exam which focused on other unauthorized disbursements. Williams claimed that the trial court's decision not to admit the

polygraph evidence "impacted greatly" on his decision not to testify before findings. *But see Gipson*, 24 M.J. at 253 (Court of Appeals "would not condone [the admission of] such opinion testimony absent the examinee's consistent testimony"). Nevertheless, the Army Court examined the reasons the drafters gave for the rule. The Court found several of those reasons to be "in the nature of matters that are routinely resolved by trial judges under Mil.R.Evid. 403," and the final reason (concerns about reliability) to be "in its worst light, disingenuous, and at best incongruous with the substantial investment the Department of Defense has made, and continues to make in polygraph examinations—not to mention the observation in *Gipson* that '[t]he greater weight of authority indicates that [the polygraph] can be a helpful scientific tool.'" *Williams*, 39 M.J. at 555 (quoting *Gipson*, 24 M.J. at 249). Based on its reading of *Washington, Chambers*, and *Rock*, the Court went on to hold, "under the facts presented," the appellant's

> Fifth Amendment right to a fair trial by court-martial, combined with his Sixth Amendment right to produce favorable witnesses on his behalf, affords him the opportunity to be heard of these foundational matters, and allows for the possibility of admitting polygraph evidence, notwithstanding the explicit prohibition of Mil.R.Evid. 707.

*Williams*, 39 M.J. at 555. Although the Army Court appears to have restricted its opinion to the facts of the case, we are unable to discern what circumstances would trigger a different result.

## F. Analysis

 We believe the case law suggests a framework for examining constitutional challenges to rules of evidence which prohibit an accused from presenting evidence:

> (1) The testimony must be relevant under Mil.R.Evid. 401 and 402 and vital to the defense when evaluated in the context of the entire record. If the evidence is either irrelevant or not vital to the defense, there is no constitutional right to present it.

(2) The rule of evidence may not *arbitrarily* limit the accused's ability to present reliable evidence.

(3) If the rule permits the admission of the evidence for some purpose, but not for others, it may not *arbitrarily* limit admission by the defense to a greater degree than by the prosecution.

(4) The rule of evidence must not *arbitrarily* infringe on the right of the accused to testify on his own behalf.

■ Applying these principles, we hold that the President's prohibition of the admission of polygraph evidence in Mil.R.Evid. 707(a) was a constitutionally permissible exercise of his Article 36(a), UCMJ, authority to prescribe modes of proof for trials by courts-martial.

■ (1) The Court of Military Appeals has held that polygraph evidence may be relevant to the credibility of a witness. We will assume appellant's credibility was relevant and vital to his defense. *See Rodriguez,* 37 M.J. at 452; *Gipson.* However, we do not believe presentation of polygraph evidence was vital to the court member's assessment of appellant's credibility.

■ (2) Mil.R.Evid. 707 does not arbitrarily limit the accused's ability to present reliable evidence.

(a) A rule is arbitrary if it is "determined by chance, whim, or impulse, and not by necessity, reason, or principle." *The American Heritage Dictionary of the English Language* 94 (3d ed. 1992). The President's decision to prohibit polygraph evidence is not based on whim or impulse, but rather on sound reasoning. The Court of Military Appeals noted still valid concerns about the soundness of the underlying principles of the technique and the reliability of any particular polygraph evidence. *Gipson,* 24 M.J. at 248–49. That is why the Court assigned polygraph results to the middle class of scientific evidence. The President is rightly concerned that courts-martial could degenerate into a battle of polygraph examinations and experts that would impose a burden on the administration of military justice that would outweigh the probative value of the evidence. See *Helton,* 10 M.J. at 824 n. 15 (citing

*United States v. Urquidez,* 356 F.Supp. 1363 (C.D.Cal.1973) (experience of District Judge in hearing 3 days of foundational evidence)).

(b) We are unwilling to follow the Army Court of Military Review's holding in *Williams.* The fact that military judges are often called upon to resolve issues similar to some of the concerns expressed by the drafters of Mil.R.Evid. 707, or that the Department of Defense uses the polygraph as an investigative tool, does not bar the President from determining that the probative value of polygraph evidence is substantially outweighed by other more compelling factors. The *Gipson* decision made sense in the absence of a rule prohibiting the admission of polygraph evidence. The Court of Military Appeals established the method for resolving the admission of all manner of scientific evidence, not just polygraph evidence—let the military judge hold an evidentiary hearing and render a decision. But, we believe the drafters' concerns for admitting polygraph evidence are significant enough for the President, exercising his Article 36(a), UCMJ, authority, to formulate a rule of evidence excluding it from courts-martial.

(c) "The first case to reject the admissibility of polygraph results was *Frye v. United States,* 293 F. 1013 (D.C.Cir.1923)." *Gipson,* 24 M.J. at 250. Over the years since *Frye,* the admissibility of polygraph evidence has been continually litigated in the federal courts, both on direct appeal and in *habeas corpus* actions. Nevertheless, we have been unable to locate any federal case, before or after the promulgation of the Federal Rules of Evidence, which suggests that the federal rule, or any similar state rule, unconstitutionally interferes with an accused's rights to due process or to present a defense.

(d) Furthermore, Mil.R.Evid. 707 applies a rule of evidence generally recognized by the federal courts. While not a part of the Federal Rules of Evidence, most of the federal circuit courts of appeal still hold that polygraph evidence cannot be introduced into evidence to establish the truth of statements made during the polygraph examination. See *United States v. Bounds,* 985 F.2d 188, 192 n. 2 (5th Cir.1993); *United States v. A &*

S Council Oil Co., 947 F.2d 1128 (4th Cir. 1991); United States v. Lynn, 856 F.2d 430 (1st Cir.1988); United States v. Bowen, 857 F.2d 1337 (9th Cir.1988); United States v. Hall, 805 F.2d 1410, 1416 (10th Cir.1986); United States v. Cardarella, 570 F.2d 264 (8th Cir.1978); see also United States v. Rea, 958 F.2d 1206, 1224 (2d Cir.1992) (Court had "intimated in past" that results not admissible, so trial judge did not abuse his discretion in ruling that polygraph was not sufficiently reliable to warrant admission); United States v. Piccinonna, 885 F.2d 1529 (11th Cir.1989) (trial judge has discretion to admit polygraph evidence when both parties stipulate in advance as to circumstances of the test and the scope of admissibility and, subject to three preliminary conditions, to impeach or corroborate the testimony of a witness at trial. The three conditions are: adequate notice to opposing party, opposing party given reasonable opportunity to have subject tested by own expert using substantially the same questions, and whether used to impeach or corroborate, admissibility is governed by the Federal Rules of Evidence, including Fed. R.Evid. 608. "Even where the above three conditions are met, admission of polygraph evidence for impeachment or corroboration purposes is left entirely to the discretion of the trial judge." 885 F.2d at 1536).

(e) While it might be arbitrary for the President to promulgate a rule which prohibits the admission of evidence which is assigned to the top scientific class, such as fingerprint evidence, we do not believe it is arbitrary to prohibit those techniques which fall into the middle or bottom classes, which by definition are less reliable. See Gipson, 24 M.J. at 249.

(3) The Mil.R.Evid. 707(a) prohibition on the admission of evidence is comprehensive and equally applicable to both the prosecution and the defense.

(4) Mil.R.Evid. 707(a) did not infringe on the right of the accused to testify on his own behalf.

■ We believe Mil.R.Evid. 707 is a permissible rule "designed to assure both fairness and reliability in the ascertainment of guilt and innocence." Chambers, 410 U.S. at 302, 93 S.Ct. at 1049. We, therefore, reject

the Army Court's reasoning in Williams and hold that Mil.R.Evid. 707 did not unconstitutionally infringe on appellant's rights to due process and to present a defense. Accordingly, the military judge did not err in preventing appellant from laying a foundation for the admission of polygraph evidence.

## II. County of Riverside v. McLaughlin Credit

On 13 May 1992, near Centerville, Iowa, an Iowa State Police officer apprehended appellant for speeding and driving on a suspended license. Appellant told the officer he was on leave from March Air Force Base. The officer called the squadron and discovered that appellant was absent without leave. The squadron first sergeant asked the officer to detain appellant until military personnel could escort him back to the base. On 15 May, a military escort accompanied appellant back to March Air Force Base, where appellant's commander ordered him into pretrial confinement at 0030, 16 May. On 18 May, the commander completed a written memorandum, in accordance with R.C.M. 305(h)(2), concluding there was probable cause to believe appellant committed several named offenses under the UCMJ, and determining that continued pretrial confinement was necessary. On 20 May, the area defense counsel asked for a delay until 28 May in the pretrial confinement hearing to be conducted by a military magistrate. On 28 May, the military magistrate conducted the hearing and ordered appellant's confinement continued.

■ A person arrested without a warrant must "be given a prompt judicial determination of probable cause as a prerequisite to pretrial detention." United States v. Rexroat, 38 M.J. 292, 294 (C.M.A.1993) (citing Gerstein v. Pugh, 420 U.S. 103, 95 S.Ct. 854, 43 L.Ed.2d 54 (1975)), cert. denied, —— U.S. ——, 114 S.Ct. 1296, 127 L.Ed.2d 648 (1994). "[P]robable cause determinations made after 48 hours of arrest are presumptively untimely," and " 'the burden shifts to the government to demonstrate the existence of a bona fide emergency or other extraordinary circumstance.' " Rexroat, 38 M.J. at 294 (quoting County of Riverside v. McLaughlin, 500

U.S. 44, 57, 111 S.Ct. 1661, 1670, 114 L.Ed.2d 49 (1991)). "If military exigencies prevent completion of probable-cause review within 48 hours, the fact of these exigencies may be used to rebut the presumption." *Rexroat,* 38 M.J. at 295–96. If the commander's probable cause determination, made under either R.C.M. 305(d) or (h), is made within 48 hours, and the commander is neutral and detached, then *Gerstein* and *McLaughlin* are satisfied. *Rexroat,* 38 M.J. at 298.

▮ We first must decide when the *McLaughlin* 48 hours started to run—upon appellant's apprehension in Iowa or some later time. The Court of Military Appeals has ruled that the 48 hours starts at the time the commander actually orders the service member into pretrial confinement, not the time he was taken into custody. *Rexroat,* 38 M.J. at 295. When the accused's official custody is not at the direction of military authority and the military makes reasonably diligent efforts to secure physical custody over him and order him into pretrial confinement, we believe it does not make sense to start the clock until the commander actually orders him into pretrial confinement. Thus, we consider the 48–hour clock to have started at 0030, 16 May 1992. Even if the clock started when military authority requested appellant be detained in Iowa, we believe the military exigencies of getting him back to March Air Force Base overcame the *McLaughlin* presumption that the probable cause determination was untimely. *Rexroat,* 38 M.J. at 295–96.

▮ Next, we must determine if appellant's commander was "neutral and detached," such that either his initial confinement order or decision to continue confinement satisfies *Gerstein* and *McLaughlin.* Although the commander later preferred charges against appellant, there is no evidence of record to suggest he was "directly or particularly involved in the command's law enforcement function." *United States v. McLeod,* 39 M.J. 278 (C.M.A.1994) (quoting *United States v. Lynch,* 13 M.J. 394, 397 (C.M.A.1982)); *see United States v. Lopez,* 35 M.J. 35, 41 (C.M.A.1992). Therefore, we hold the commander was neutral and detached.

▮ Finally, we must determine whether the commander had probable cause to place appellant into pretrial confinement. The prosecution did not present any evidence to show what information the commander had before him when he ordered appellant into pretrial confinement. Therefore, we are unable to conclude that, at the time he ordered appellant into pretrial confinement, the commander had probable cause to believe that appellant had committed an offense under the UCMJ, and that pretrial confinement was required by the circumstances. *See* R.C.M. 304(c); *Courtney v. Williams,* 1 M.J. 267 (C.M.A.1976). However, we find the commander's memorandum of his decision to retain appellant in confinement, dated 18 May, amply complies with *Gerstein* and R.C.M. 305(h)(2)(B). The prosecution failed to present evidence from which we could conclude that this memorandum, or the decision on which it was based, was accomplished within 48 hours (by 0030, 18 May). Although R.C.M. 305(k) does not specifically speak to the *McLaughlin* rule, we believe it is appropriate to apply its remedies to *McLaughlin* violations. Therefore, we hold that appellant is entitled to 1 extra day of pretrial confinement credit against his sentence. Since appellant has already served his confinement, we order the credit be converted to 1 day of total forfeitures. *See* R.C.M. 305(k).

### III. Speedy Trial

Appellant insists that the military judge should have dismissed the charges against him with prejudice because the prosecution failed to bring him to trial within 90 days of the initiation of his pretrial confinement. Appellant's attack is broad in scope. He claims that neither the special court martial convening authority nor the Article 32 investigating officer were authorized to grant delays for speedy trial accounting: the special court-martial convening authority because the case was referred to a general court-martial; the investigating officer because no convening authority had authorized him to grant delays. Normally, we review the military judge's rulings on speedy trial for an abuse of discretion and reasonableness. *United States v. Longhofer,* 29 M.J. 22, 28

(C.M.A.1989). Of course, we may find the facts ourselves, if we so desire. Article 66(c), UCMJ, 10 U.S.C. § 866(c) (1994).

■■■ "The accused shall be brought to trial within 120 days after the earlier of (1) Preferral of charges; (2) The imposition of restraint under R.C.M. 304(a)(2)–(4); or, (3) Entry on active duty under R.C.M. 204." R.C.M. 707(a); *see United States v. Kossman,* 38 M.J. 258 (C.M.A.1993) (overruling *United States v. Burton,* 21 U.S.C.M.A. 112, 44 C.M.R. 166, 1971 WL 12477 (1971) and *United States v. Driver,* 23 U.S.C.M.A. 243, 49 C.M.R. 376, 1974 WL 14085 (1974) presumption of speedy trial violation when pretrial confinement exceeds 90 days). "All periods of time covered by stays issued by appellate courts and all other pretrial delays approved by a military judge or the convening authority shall be excluded when determining whether the period in subsection (a) of this rule has run." R.C.M. 707(c). Regardless of the 120–day rule, the prosecution must take immediate steps to bring a confined accused to trial. Article 10, UCMJ, 10 U.S.C. § 810 (1988); *Kossman,* 38 M.J. at 262 ("reasonable diligence" suggested as appropriate standard to evaluate Article 10 mandate).

■■■ Appellant was initially apprehended on 13 May 1992 by the Iowa police for violation of Iowa law. However, since the record is unclear as to whether appellant remained in custody in Iowa because of the civilian charges or to await escorts to return him to military control, we consider his pretrial confinement, for speedy trial purposes, to have begun on 13 May 1992. *See United States v. Keaton,* 18 U.S.C.M.A. 500, 40 C.M.R. 212, 1969 WL 6045 (1969) (date of confinement for speedy trial purposes is date incarcerated for military offense). Appellant was arraigned 154 days later—14 October 1992. At the defense request, the military judge granted a 34–day delay from 10 September to 14 October 1992. Thus, appellant was brought to trial on the 120th day under R.C.M.. 707. We need not reach appellant's assertions that neither the special court-martial convening authority nor the investigating officer had the authority to grant delays in this case. We conclude the prosecution was timely under R.C.M. 707 and was pursued with reasonable diligence under Article 10, UCMJ.

## IV. Conclusion

The findings and sentence are correct in law and fact, and except for the *McLaughlin* credit for which appellant will be compensated 1 day of pay and allowances, no error prejudicial to the substantial rights of appellant occurred. Accordingly, the findings and sentence are

AFFIRMED.

Chief Judge DIXON, Senior Judges SNYDER, RAICHLE, and HEIMBURG, and Judges GAMBOA and BECKER concur.

Judge PEARSON, joined by Judge SCHREIER, (concurring in part and dissenting in part):

Speaking for the majority in *United States v. Gipson,* Judge Cox summarized his view on the reliability of polygraph evidence:

> In our assessment, the state of the polygraph technique is such that, depending on the competence of the examiner, the suitability of the examinee, the nature of the particular testing process employed, and such other factors as may arise, the results of a particular examination may be as good as or better than a good deal of expert and lay evidence that is routinely and uncritically received in criminal trials. Further, it is not clear that such evidence invariably will be so collateral, confusing, time-consuming, prejudicial, etc., as to require exclusion.

*United States v. Gipson,* 24 M.J. 246, 253 (C.M.A.1987).

If Judge Cox is right, and we think he is, this appellant was denied his constitutional right to lay the foundation for relevant, material, and favorable exculpatory evidence vital for his defense. *See, e.g., Chambers v. Mississippi,* 410 U.S. 284, 93 S.Ct. 1038, 35 L.Ed.2d 297 (1973) (accused's right to present evidence); *Gipson,* 24 M.J. at 254 app. (listing of articles and treatises on reliability of polygraphs); *McMorris v. Israel,* 643 F.2d 458, 461–462 (7th Cir.1981) ("[W]e note that even the most ardent detractors from the validity of polygraph evidence concede a degree of reliability of 70% or higher for prop-

erly administered examinations."), *cert. denied,* 455 U.S. 967, 102 S.Ct. 1479, 71 L.Ed.2d 684 (1982). *See also Daubert v. Merrell Dow Pharmaceuticals, Inc.,* —— U.S. ——, 113 S.Ct. 2786, 125 L.Ed.2d 469 (1993) (standard for admitting expert testimony under Fed.R.Evid. 702); *United States v. Garcia,* 40 M.J. 533 (A.F.C.M.R.1994) (standard for admitting expert testimony under Mil. R.Evid. 702); *United States v. Combs,* 35 M.J. 820 (A.F.C.M.R.1992) (same), *aff'd,* 39 M.J. 288 (C.M.A.1994).

Litigated urinalysis cases often present the classic man versus machine contest. There are no eye witnesses to the urinalysis based drug charge, nor any witnesses who testify the accused was somehow impaired, nor any other corroborating evidence of drug use. Likewise, there is no evidence to show where or how the accused allegedly used the drug, or a precise time of use. Instead, machines—operated by humans—produce results—interpreted by humans—which the prosecution uses to procure a conviction. In this regard, the prosecutor calls an expert witness to explain that the machine results show the accused's urine specimen contained a metabolite of a chemical compound which is found in the drug charged. Consequently, the prosecution's case rests entirely on scientific evidence offered under Military Rule of Evidence 702.

Do urinalysis machines, or their operators, make "mistakes" which go undetected through normal quality control? We need only look at Pentium computer chips that can't divide, nuclear reactors that go haywire, and space shuttles that don't launch to answer that question.

So what if you are wrongfully accused of drug use based on an erroneous urinalysis result? You have no eyewitnesses to shake on cross-examination, or to help you. You have no alibi witnesses unless you are in direct observation of someone for 24 hours a day, 7 days a week, since it only takes a moment alone to snort cocaine or consume most other drugs. Because of the nebulous nature of the prosecution's evidence, you basically have only your word. But, why should a judge or jury believe you, as opposed to the prosecution's "scientific" evidence, if you chose to testify? Credibility!

In a urinalysis case, the accused's credibility becomes the whole ball game if the accused denies use since urinalysis machines can't be cross-examined. If the court convicts, it chooses not to believe the accused, the only real witness to the offense. Thus, evidence reflecting favorably on the credibility of the accused's denial is relevant, material, and vital to the defense in a urinalysis case where the accused takes the stand, which brings us to polygraphs.

Polygraphs are also machines—operated by humans—which produce results—interpreted by humans. Polygraph evidence reflects on the credibility of an accused's denial of having used the drug charged. *Gipson,* 24 M.J. at 253; *McMorris,* 643 F.2d at 461–2. Is it admissible on an accused's behalf—we think so in spite of the absolute prohibition in Military Rule of Evidence 707. *See United States v. Williams,* 39 M.J. 555 (A.C.M.R. 1994).

We agree the President may promulgate rules of evidence for trials by court-martial. However, the President may not promulgate a rule which infringes on an accused's constitutional right to present relevant, material, and favorable evidence. *See, e.g., Ellis v. Jacob,* 26 M.J. 90 (C.M.A.1988) (striking down President's rule in R.C.M. 916(k)(2) precluding accused from presenting evidence of partial mental responsibility to negate state of mind element of an offense); *United States v. Hollimon,* 16 M.J. 164 (C.M.A.1983) (recognizing constitutional limit on President's bar in Mil.R.Evid. 412(a) on admission of reputation or opinion evidence of nonconsensual sexual offense victim's past sexual behavior).

Consequently, we recognize a constitutional escape clause to Military Rule of Evidence 707, similar to that found expressly in Rule 412(b) which excludes evidence of a nonconsensual sexual offense victim's past sexual behavior. Polygraph evidence is not admissible unless it is "constitutionally required to be admitted," that is, unless it is relevant, material, and favorable to the defense. *Cf. United States v. Williams,* 37 M.J. 352 (C.M.A.1993) (constitutionally required evi-

dence under Mil.R.Evid. 412). In this regard, military judges should "view liberally the question of whether the expert's testimony may assist the trier of fact." *Combs*, 35 M.J. at 826. And, "[i]f anything, in marginal cases, due process might make the road a tad wider on the defense's side than on the Government's." *Gipson*, 24 M.J. at 252.

Here, the military judge did not afford appellant the opportunity to show his polygraph evidence met the constitutionally required criteria for admission. Consequently, we would return the record of trial to The Judge Advocate General for remand to the convening authority for a hearing on the admissibility of the proffered polygraph evidence in accordance with the procedures outlined in *United States v. Williams*, 39 M.J. at 559.